*EOP*
*6-25-02*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

FILED - CLERK
U.S. DISTRICT COURT
2002 JUN 25 AM 8: 25
TX EASTERN - LUFKIN
BY_____

ALABAMA-COUSHATTA TRIBES §
OF TEXAS §
§
v. §     No. 9:01-cv-299
§
STATE OF TEXAS §

## MEMORANDUM OPINION AND ORDER

The States of Texas seeks a Permanent Injunction enjoining the operation of the Alabama-Coushatta Entertainment Center, a Las Vegas style casino that is owned and operated by the Alabama-Coushatta Tribe on Reservation lands located within Polk County, Texas. The Court conducted a trial on the merits from April 1 to April 4, 2002 in Lufkin, Texas, during the course of which the Court accepted exhibits and testimony and invited post-hearing briefs from both parties. After careful consideration, the Court is of the opinion that a permanent injunction should be issued.

The State correctly asserts that the Tribe should be permanently enjoined from operating its casino because (1) under the plain language of the Restoration Act, as codified in Title 25 of the United States Code, Section 737(a), and Texas law the Tribe is prohibited from conducting casino gaming and (2) the Tribe's resolution not to engage in gaming in exchange for restoration of its federal trust status was

36

incorporated into the Restoration Act.

## THE HISTORY AND LANGUAGE OF THE RESTORATION ACT

Prior to 1928, the Republic, and later the State of Texas, maintained a relationship with the Alabama-Coushatta Tribe through a variety of programs. From 1928 to 1954, the Tribe was under federal trust. On August 23, 1954, federal responsibility for lands held in trust by the United States for the Alabama-Coushatta Tribe was terminated pursuant to 25 U.S.C. § 721. The Termination Act authorized the Secretary of the Interior to convey to the State of Texas lands held in trust by the United States for the Tribe. The Termination Act went on to authorize the Tribe to convey to the State of Texas lands purchased for and deeded to the Tribe in accordance with an act of the legislature of the State of Texas approved February 3, 1854 so that these lands would be held in trust for the benefit of the Tribe. *See* 25 U.S.C. § 721.

In March of 1983, Jim Mattox, who was then the Attorney General of the State of Texas issued Attorney General's Opinion JM-17, which questioned the very existence of the Reservation and Tribe by ruling unconstitutional the trust relationship between the State and the Tribe. In February of 1985, Congressman Ronald Coleman addressed the House of Representatives on his behalf and on behalf of Congressman Charles Wilson, introducing legislation that would restore the federal

trust relationship with the Tigua and Alabama-Coushatta Tribes.  On August 18, 1987, after multiple amendments, the Restoration Act was passed into law. The Restoration Act provides:

> All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe.[1]  Any violation of the prohibition provided in this subsection shall be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas.  The provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T.C.-86-07 which was approved and certified on March 10, 1986.

25 U.S.C. § 737(a).  The full text of Alabama-Coushatta Tribal Resolution 86-07, which the Restoration Act expressly incorporates, reads:

> PERTAINING to the Tribal Council exercising its delegated power under Section I, Article IV, Powers, Constitution and ByLaws of the Alabama-Coushatta Indian Tribe, to manage and protect the land and natural resources of the Tribe.
>
> WHEREAS, on December 16, 1985, the United States House of Representatives passed H.R. # 1344, a bill to provide for the restoration of the federal trust relationship to the Alabama-Coushatta Indian Tribe of Texas, and H.R. # 1344 is now before the United States Senate for consideration; and,

---

[1] The Restoration Act provides: "The Alabama and Coushatta Indian Tribes of Texas shall be considered as one tribal unit for purposes of this subchapter and any other law or rule of law of the United States."  25 U.S.C. § 732.

WHEREAS, after hearings on H.R. # 1344 before the House Committee on Interior and Insular Affairs on October 17, 1985, the Comptroller of Public Accounts for the State of Texas raised concerns that H.R. # 1344 would permit the Tribe to conduct high stakes gambling and bingo operations to the detriment of existing charitable bingo operations in the State of Texas and further expressed concerns that the Alabama-Coushatta Tribe would be unable to properly manage such operations in the event the Tribe decided to undertake them, and would therefore become a prime target for organized crime; and,

WHEREAS the Comptroller urged members of the Texas Congressional Delegation to defeat H.R. # 1344 unless the bill was amended to provide for direct application of state laws governing gaming and bingo on the Reservation; and

WHEREAS, the Alabama-Coushatta Tribe had no interest in conducting high stakes bingo or other gambling operations on its Reservation, regardless of whether such activities would be governed by Tribal law, state law or federal law; and,

WHEREAS, in response to the concerns voiced by the Comptroller and other officials, the Tribe attempted to insure that H.R. # 1344 would give the Tribe no competitive advantage in gaming operations by agreeing to amend H.R. # 1344 to provide that any gaming activities on the Reservation would be conducted pursuant to Tribal law that would be required to be identical to state law, and H.R. # 1344 was so amended by the House Interior Committee; and,

WHEREAS, some state officials and members of the Texas Congressional Delegation continue to express concern that H.R. # 1344, as amended, does not provide adequate protection against high stakes gaming operations on the

Reservation; and

WHEREAS, the proposal that H.R. # 1344 be amended to make state gaming laws applicable on the Reservation continues to be wholly unsatisfactory to the Tribe in that it represents a substantial infringement upon the Tribes' powers of self-government, is inconsistent with the central purpose of restoration of the federal trust relationship, and would set a potentially dangerous precedent for other Tribes who desire to operate gaming facilities and are presently resisting attempts by states to apply their law to Reservation gaming activities; and

WHEREAS, the Alabama-Coushatta Tribe remains firm in its commitment to prohibit outright any gambling or bingo in any form on its Reservation; and,

WHEREAS, although the Tribe, as a matter of principle, sees no justification for singling out the Texas Tribes for treatment different than that accorded other Tribes in this country, the Tribe strongly believes that the controversy over gaming must not be permitted to jeopardize this important legislation, the purpose of which is to ensure the Tribe's survival, protect the Tribe's ancestral homelands and provide the Tribe with additional tools to become economically and socially self-sufficient;

NOW THEREFORE BE IT RESOLVED that the Alabama-Coushatta Tribe respectfully requests its representatives in the United States Senate and House of Representatives to amend Section 207 of H.R. # 1344 by striking all of that section as passed by the House of Representatives and substituting in its place language which would provide that all gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the state of Texas, shall be prohibited on the Tribe's reservation or on Tribal land.

> PASSED AND APPROVED this 10th day of March, 1986,
> and recorded in the minutes of the regular called meeting
> of the Tribal Council on March 10, 1986.

Alabama-Coushatta Tribal Resolution # 86-07.

## Governing Law Interpreting the Restoration Act

This Court is not writing on a blank slate. The United States Court of Appeals for the Fifth Circuit, whose decisions are binding on this Court, has expressly addressed the issue of whether tribes governed by the Restoration Act[2] may conduct gambling operations on Reservation lands, concluding that they may not, in *Ysleta del Sur Pueblo v. State of Texas*, 36 F.3d 1325 (5th Cir 1994) (*Ysleta I*). The Fifth Circuit's decision was appealed to the United States Supreme Court, which denied certiorari, thereby declining to review the Fifth Circuit's decision. *See Ysleta del Sur*

---

[2]

The Fifth Circuit recognized that the Alabama-Coushatta Tribe was not a party to the suit. The Court explained that:

> The Restoration Act restored not only the Ysleta del Sur Pueblo's federal trust status but also the federal trust status of the Alabama and Coushatta Indian tribes. The Act has two titles. Title I, 25 U.S.C. § 1300g, concerns the Ysleta del Sur Pueblo, and Title II, 25 U.S.C. §§ 731-37, concerns the Alabama and Coushatta Indian tribes. The two titles are nearly identical, particularly with regard to the sections concerning gaming. It is important to note that the Alabama and Coushatta Indian tribes are *not* parties to this suit. In fact, these tribes recently voted to *not* engage in casino-style gambling on their reservation. *See* Dianna Hunt, *Indians Defeat Plan for Casino on Reservation*, HOUSTON CHRON., June 16, 1994, at 1A.

*Ysleta I*, 26 F.3d at 1329 n. 3 (emphasis in original).

-6-

*Pueblo v. Texas*, 514 U.S. 1016 (1995). Earlier this year, the Fifth Circuit affirmed the issuance of an injunction by the United States District Court for the Western District of Texas, through which the District Court ordered the Ysleta del Sur Pueblo Indians to cease, desist, terminate and refrain from engaging in, permitting, promoting, and conducting activities at the Speaking Rock Casino Entertainment Center operated by the Yselta del Sur Pueblo Indians in El Paso, Texas. *See State of Texas v. Ysleta del Sur Pueblo*, No. 01-51129 (5th Cir. 2002) ("We affirm the judgment of the district court essentially for the reasons stated in its careful, thorough September 27, 2001 Memorandum Opinion.").

The Tribe asks the Court to disregard these prior rulings, arguing that the Fifth Circuit's interpretation of the Restoration Act was dicta, *i.e.* unnecessary to the Fifth Circuit's decision, and therefore is not controlling. Even accepting for the sake of argument that portions of the Fifth Circuit's holding in *Yselta I* are dicta, the Court rejects this approach, believing it to be inconsistent with the United States Supreme Court's teaching that: "It cannot be said that a case is not authority on one point because, although that point was properly presented and decided in the regular course of the consideration of the cause, something else was found in the end which disposed of the whole matter." *Florida Cent. R. Co. v. Schutte*, 103 U.S. 118, 143 (1880). Moreover, this Court finds itself in agreement with the spirit of the Fifth Circuit's

-7-

observation in *Nardone v. Reynolds*, 538 F.2d 1131 (5th Cir. 1976), decided nearly one hundred years after the United States Supreme Court decided the *Schutte* case, in which the Fifth Circuit wrote: "To the sometimes veiled suggestion this was a gratuitous statement not necessary to the Court's decision, it is at least considered dicta of hurricane velocity[.]" *Reynolds*, 538 F.2d at 1135 n. 11.

In *Ysleta I*, the State of Texas appealed the decision of the United States District Court for the Western District of Texas, challenging the district court's granting of summary judgment in favor of the Ysleta del Sur Pueblo Tribe in its suit against the State of Texas and the Governor for refusing to negotiate a compact that would allow the Tribe to engage in casino-style gambling on its Reservation. The District Court had held that neither the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701-21, nor the Restoration Act, barred the Tribe from engaging in such gambling. The Fifth Circuit held that the Restoration Act, not IGRA governed the dispute and reversed the district court's grant of summary judgment, holding that IGRA did not give the Tribe the right to sue the State of Texas in federal court.

The following analysis from *Yselta I* demonstrates that the Tribe's assertion that the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987) was incorporated into the Restoration Act has been explored and rejected in this Circuit.

-8-

In the midst of the 100th Congress' deliberations over the Restoration Act, the Supreme Court issued its opinion in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). In that case, two Indian tribes located in California were sponsoring unregulated gaming activities on their reservations. The state of California attempted to enforce against the tribes a state statute regulating bingo operations. The tribes sued, asserting that California had no authority to enforce its gambling laws and regulations on tribal reservations because the United States, which has plenary power over Indian affairs, had not authorized California to do so. California argued that, pursuant to Public Law 280 of 1953, the United States had expressly authorized California to enforce its bingo statute against the tribes. Public Law 280 specifically granted California authority to (1) enforce its criminal laws on Indian reservations, and (2) hear in its courts civil causes of action in which an Indian is a party. California argued in *Cabazon Band* that its bingo statute was a criminal law which could be enforced on Indian reservations.

The Supreme Court disagreed. The Court began by noting that, while Public Law 280 broadened California's authority with regard to Indian reservations, Congress did not intend to grant it general civil regulatory authority. Public Law 280, the Court reasoned, was narrowly tailored to combat lawlessness on reservations and *not* "to effect total assimilation of Indian tribes into mainstream American society." *Cabazon Band*, 480 U.S. at 207-08, 107 S.Ct. at 1087. Thus, according to the Court, when a state invokes Public Law 280 to enforce its laws, it must be determined whether the law is "criminal" in nature, and therefore applicable, or "civil" in nature, and therefore inapplicable *except* when the law is relevant to private civil litigation in state court. The question of whether a law is criminal or civil, in turn, depends on the law's practical

effect. That is, a state law is criminal, and thus applicable under Public Law 280, if it generally *prohibits* certain conduct, but a state law is civil, and presumptively applicable, if it *regulates* the conduct at issue. *Cabazon Band*, 480 U.S. at 209-10, 107 S.Ct. at 1088.

Applying the criminal-prohibitory/ civil-regulatory dichotomy, the Court rejected California's claim that its bingo statute was criminal in nature on the basis that the statute is not a general prohibition on certain conduct. Instead, "the state law generally permits the conduct at issue, subject to regulation." *Id.* at 209, 107 S.Ct. at 1088. The Court analogized California's bingo statute to the state's other gambling statutes, all of which regulate (rather than prohibit) the relevant conduct. The Court concluded that, given the extent to which the state currently regulated gambling, California had no public policy against bingo in particular or gambling in general. *Id.* at 211, 107 S.Ct. at 1089. California therefore could not prohibit the tribes from offering the gaming activities on their reservations.

\*\*\*\*

The Tribe argues that Texas does not prohibit the Tribe's proposed gaming activities by pointing to the State's broad definition of a lottery: "'Lottery' means the procedures operated by the state under this chapter through which prizes are awarded or distributed by chance among persons who have paid, or unconditionally agreed to pay, for a chance or other opportunity to receive a prize." Tex. Gov't Code Ann. § 466.002(3) (Vernon Supp. 1994). The Tribe contends that its proposed gaming activities fall within the State's definition of lottery. That is, like a lottery, the Tribe's proposed gaming activities (i.e., baccarat, blackjack, craps, roulette and slot machines) are all games of prize, chance and consideration. Because the State permits one type of game where the elements are

-10-

prize, chance and consideration, the State no longer prohibits any other games with the same elements. The State, instead, merely regulates them. Consequently, according to the Tribe, § 107(a) of the Restoration Act does not act as an independent bar to the Tribe's proposed gaming activities.

\*\*\*\*

[I]n considering the Restoration Act, Congress clearly was concerned with enacting the compromise between the Tribe, the State and various members of the Texas congressional delegation.

\*\*\*\*

[I]f Congress intended for the *Cabazon Band* analysis to control, why would it provide that one who violates a certain gaming prohibition is subject to a *civil* penalty? We thus conclude that Congress did not enact the Restoration Act with an eye towards *Cabazon Band*. Congress was merely acceding to the Tribe's request that the tribal resolution be codified. *See* S. REP. NO. 90 at 8 (the Tribe, "by formal resolution, requested that this legislation incorporate [its] existing law and custom that forbids gambling").

\*\*\*\*

The Tribe's second argument admittedly raises a closer question. In August 1987, as the Restoration Act was on the brink of final passage in the House of Representatives, a member made the following statement on the floor of the House:

> It is my understanding that the Senate amendments to [§ 107(a)] are in line with the

-11-

> rational [sic] of the recent Supreme Court
> decision in the case of Cabazon Band of
> Mission Indians versus California. This
> amendment in effect would codify for [the
> Tribe] the holding and rational [sic] adopted
> in the Court's opinion in the case.

133 CONG. REC. H6975 (daily ed. Aug. 3, 1987)
(statement of Rep. Udall). Standing alone, this statement
supports the Tribe's argument that Congress intended to
incorporate *Cabazon Band* into the Restoration Act. But
we find ourselves confronted with substantial legislative
history to the contrary, including the plain language of §
107(a), its accompanying report language, and the tribal
resolution to which § 107(a) expressly refers. We cannot
set aside this wealth of legislative history simply to give
meaning to the floor statement of just one representative
that was recited at the twelfth hour of the bill's
consideration. *See, e.g., Fort Stewart Schools v. Federal
Labor Relations Auth.*, 495 U.S. 641, 648-50, 110 S.Ct.
2043, 2047-48, 109 L.Ed.2d 659 (1990). Rather, upon
reviewing these materials, we are left with the
unmistakable conclusion that Congress—and the
Tribe—intended for Texas' gaming laws and regulations to
operate as surrogate federal law on the Tribe's reservation
in Texas.

\*\*\*\*

The Tribe warns that our conclusion (i.e., that Texas
gambling laws and regulations are surrogate federal law)
will constitute a substantial threat to its sovereignty in that
"[e]very time the State modifies its gambling laws, the
impact will be felt on the reservation." However, any
threat to tribal sovereignty is of the Tribe's own making.
The Tribe noted in its resolution that it viewed § 107(a) of
the Restoration Act as "a substantial infringement upon the

> Tribes' [sic] power of self government" but nonetheless concluded that relinquishment of that power was necessary to secure passage of the Act.   To borrow IGRA terminology, the Tribe has already made its "compact" with the state of Texas, and the Restoration Act embodies that compact. If the Ysleta del Sur Pueblo wishes to vitiate the compact it made to secure passage of the Restoration Act, it will have to petition Congress to amend or repeal the Restoration Act rather than merely comply with the procedures of IGRA.

*Yselta I,* 36 F.3d at 1329-35 (emphasis in original) (footnotes omitted).

The Fifth Circuit has carefully considered and rejected the Tribe's assertion that the Restoration Act codified the Supreme Court's decision in *Cabazon Band*. The Fifth Circuit has also rejected the argument that the State of Texas may not prohibit gaming on the Tribe's reservation because State law authorizes a lottery and other games of chance. Even in light of testimony presented at trial which shows that Congressman Morris Udall's statement was not a twelfth hour statement and that the games authorized under Texas law are comparable to the games being played in the Tribe's Entertainment Center in some respects, this Court concludes that the well reasoned analysis of the Fifth Circuit controls this case. By affirming the propriety of the injunction issued by the Western District of Texas, in which the district court relied heavily on *Yselta I*, the Fifth Circuit has confirmed the continuing vitality of its analysis irrespective of the  Alabama-Coushatta Tribal Council's April 26, 2001

revocation and retraction of Tribal Resolution No. T.C.-86-07. As the Tribe's case hinges on whether or not *Cabazon Band* was incorporated into the Restoration Act, and this Court concludes, based on the plain language of the statute and its interpretation by the Fifth Circuit that it was not, the Court proceeds to whether the Tribe's activities violate Texas law and whether the State is entitled to the relief it seeks.

TEXAS LAW ON GAMBLING

The parties stipulated that the Entertainment Center operated by the Tribe is a place where activities are conducted which violate the provisions of the Texas Penal Code set forth below. The parties also stipulated that the Tribe intends to continue these activities at the Entertainment Center.

Section 47.02 of the Texas Penal Code, which defines the offense of Gambling, provides, in pertinent part:

> (a) A person commits an offense if he:
>
>> (1) makes a bet on the partial or final result of a game or contest or on the performance of a participant in a game or contest; [or]
>>
>> (3) plays and bets for money or other thing of value at any game played with cards, dice, balls, or any other gambling device.
>
> (b) It is a defense to prosecution under this section that:

(1) the actor engaged in gambling in a private place;

(2) no person received any economic benefit other than personal winnings; and

(3) except for the advantage of skill or luck, the risks of losing and the chances of winning were the same for all participants.

(c) It is a defense to prosecution under this section that the actor reasonably believed that the conduct:

(1) was permitted under Chapter 2001, Occupations Code;

(2) was permitted under Chapter 2002, Occupations Code;

(3) consisted entirely of participation in the state lottery authorized by the State Lottery Act (Chapter 466, Government Code);

(4) was permitted under the Texas Racing Act (Article 179e Vernon's Texas Civil Statutes); or

(5) consisted entirely of participation in a drawing for the opportunity to participate in a hunting, fishing, or other recreational event conducted by the Parks and Wildlife Department.

Section 47.03 of the Texas Penal Code, which defines the offense of Gambling Promotion, provides, in pertinent part:

(a) A person commits an offense if he intentionally or knowingly does any of the following acts:

-15-

(1) operates or participates in the earnings of a gambling place;

(3) for gain, becomes a custodian of anything of value bet or offered to be bet; [or]

(5) for gain, sets up or promotes any lottery or sells or offers to sell or knowingly possesses for transfer, or transfers any card, stub, ticket, check, or other device designed to serve as evidence of participation in any lottery.

Section 47.04(a) of the Texas Penal Code, which defines the offense of Keeping a Gambling Place, provides:

(a) A person commits an offense if he knowingly uses or permits another to use as a gambling place any real estate, building, room, tent, vehicle, boat, or other property whatsoever owned by him or under his control, or rents or lets any such property with a view or expectation that it be so used.

(b) It is an affirmative defense to prosecution under this section that:

(1) the gambling occurred in a private place;

(2) no person received any economic benefit other than personal winnings; and

(3) except for the advantage of skill or luck, the risks of losing and the chances of winning were the same for all participants.

Section 47.06 of the Texas Penal Code, which defines the offense of Possession of

Gambling Device, Equipment, or Paraphernalia, provides, in pertinent part:

> (a) A person commits an offense if, with the intent to
> further gambling, he knowingly owns, manufactures,
> transfers, or possesses any gambling device that he knows
> is designed for gambling purposes or any equipment that
> he knows is designed as a subassembly or essential part of
> a gambling device.

> (c) A person commits an offense if, with the intent to
> further gambling, the person knowingly owns,
> manufactures, transfers commercially, or possesses
> gambling paraphernalia.

> (d) It is a defense to prosecution under Subsections (a) and
> (c) that:

>> (1) the device, equipment, or paraphernalia is used
>> for or is intended for use in gambling that is to occur
>> entirely in a private place;

>> (2) a person involved in the gambling does not
>> receive any economic benefit other than personal
>> winnings; and

>> (3) except for the advantage of skill or luck, the
>> chance of winning is the same for all participants.

> (f) It is a defense to prosecution under Subsection (a) or
> (c) that the person owned, manufactured, transferred, or
> possessed the gambling device, equipment, or
> paraphernalia for the sole purpose of shipping it to
> another jurisdiction where the possession or use of the
> device, equipment, or paraphernalia was legal.

-17-

Additionally, section 125.001 of the Texas Civil Practice and Remedies Code, which

relates to Common Nuisances, provides, in pertinent part,

> (a) A person who knowingly maintains a place to which
> persons habitually go for the following purposes maintains
> a common nuisance:
>
> (1) prostitution or gambling in violation of the Penal
> Code[.]

Section 125.041(1) of the Texas Civil Practice and Remedies Code, which relates to

Public Nuisances, provides, in pertinent part,

> For the purposes of this subchapter, a public nuisance is
> considered to exist at a place if one or more of the
> following acts occurs at that place on a regular basis:
>
> (1) gambling, gambling promotion, or communication
> of gambling information, as prohibited by Chapter 47,
> Penal Code[.]

## FINDINGS OF FACT

Based on the uncontested evidence presented at trial, including a video tape

showing the activities at the Entertainment Center, and the parties' Joint Stipulations,

the Court finds that the activities of the Alabama-Coushatta Tribe at the Tribe's

Entertainment Center constitute violations of Texas law, which operates as surrogate

federal law on the Tribe's reservation in Texas.   Specifically, in running the

Entertainment Center, the Tribe is committing violations of Texas Penal Code §§

47.02(a)(1) & (3), 47.03(a)(1), (3), & (5), 47.04(a), and 47.06(a) & (c)). Facts do not exist which would give rise to the defenses provided by these statutes. Additionally, the Court finds that the Entertainment Center is a Common and Public Nuisance, as these terms are defined by sections 125.001(a)(1) and 125.041(1) of the Texas Civil Practice and Remedies Code.

INJUNCTIVE RELIEF

"When an injunction is explicitly authorized by statute, proper discretion usually requires its issuance if the prerequisites for the remedy have been demonstrated and the injunction would fill the legislative purpose." *United States v. Buttorff*, 761 F.2d 1056, 1059 (5th Cir. 1985). The Restoration Act specifically provides that any violations of its prohibition on gaming activities shall be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas. *See* 25 U.S.C. § 737(a). The Restoration Act also provides "nothing in this section shall be construed as precluding the State of Texas from bringing an action in the courts of the United States to enjoin violations of the provisions of this section." 25 U.S.C. § 737 (c). Additionally, section 125.022(a) of the Texas Civil Practice and Remedies Code authorizes the Attorney General to sue to enjoin the use

of places constituting a Public Nuisance.[3]   The injunction sought by the State of Texas is authorized by both state and federal statutes.

A party seeking injunctive relief must show (1) actual success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted;  (3) the threatened injury to the plaintiff outweighs the potential harm from the injunction to the defendant;  and (4) the public interest will not be jeopardized by the grant of the injunction. *See Buttorff*, 761 F.2d at 1059 n. 3. *See also Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n. 12 (1987). Because Texas' gaming laws and regulations operate as surrogate federal law on the Tribe's Reservation in Texas and the State has shown that Texas gaming laws are being violated at the Tribe's Entertainment Center, the State has succeeded on the merits.

The Fifth Circuit "recognize[s] that '[a]s a general rule, courts are reluctant to issue injunctions against the commission of a crime,' although 'if the court finds that the prosecution of the criminal charge is not an adequate remedy, as when the conduct is creating a widespread public nuisance ... the fact that a crime is involved should not prevent the court from entering an injunction.'" *Buttorff*, 761 F.2d 11 at 1063 (*citing* Wright & Miller, *Federal Practice and Procedure:  Civil* § 2942 at 386-87).  The

---

[3] "A district, county, or city attorney, the attorney general, or a citizen of the state may sue to enjoin the use of a place for purposes constituting a nuisance under this subchapter." Tex. Civ. Prac. & Rem. Code § 125.022(a) (Vernon 2002).

Texas Civil Practice and Remedies Code's definition of a Public Nuisance encompasses gaming and gambling, as such terms are defined by chapter 47 of the Texas Penal Code.  Criminal prosecution on a case by case basis would be unduly burdensome given that the activities at the Entertainment Center constitute a Public Nuisance.

The Tribe opened its Entertainment Center in late November of 2001.  Two months earlier, the United States District Court for the Western District of Texas interpreted the Restoration Act as making gambling unlawful on the Tribal Reservation lands of the Ysleta del Sur Pueblo Tribe.  The Fifth Circuit and the parties to this case recognize that the Ysleta del Sur Pueblo and Alabama-Coushatta Tribes are affected by two titles of the United States Code which are nearly identical, particularly with regard to the sections concerning gaming. The Tribe had fair warning when it opened its Entertainment Center, that continued operation was problematic.  Tribal Chairman Kevin Battise testified that the Tribe made  enough money in the four months between when it opened the Entertainment Center and the trial that the Tribe could repay the moneys it borrowed to open the Entertainment Center.  Nearly three months have passed since the trial, during which, the Court presumes, the Tribe has continued to profit from its unlawful enterprise. The Court therefore concludes that the threatened injury of continuing operation of the

-21-

Entertainment Center to the State outweighs the potential harm to the Tribe and that the public interest is not jeopardized by the granting of an injunction against an enterprise that was unlawful from its inception.

If the Tribe wishes to operate an Entertainment Center on its Reservation, its recourse lies with the legislatures of the United States and the State of Texas. A change in the law, not an undoing of determinations made by the United States Court of Appeals for the Fifth Circuit, will allow the Tribe to conduct gambling activities on its Reservation. In making this observation, the Court is not expressing any views regarding whether a change in the law is appropriate.

For the forgoing reasons, the Alabama-Coushatta Tribe, its Tribal Council and all persons acting by, through or under the Tribe and its Tribal Council are ORDERED to cease and desist operating, conducting, engaging in, or allowing others to operate, conduct, or engage in gaming and gambling activities on the Tribe's Reservation which violate State law. The Court GRANTS the Tribe thirty (30) days within which to bring itself into full and complete compliance with its injunction.

SIGNED this 25th day of June, 2002.

John Hannah, Jr.
United States District Judge

-22-