

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## LUFKIN DIVISION

| | | |
|---|---|---|
| **STATE OF TEXAS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 9:01-CV-299** |
| | § | |
| **ALABAMA COUSHATTA TRIBE** | § | |
| **OF TEXAS,** | § | |
| | § | |
| *Defendant.* | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to 28 U.S.C. § 636(c), the Local Rules for the United States District Court for the Eastern District of Texas, and order of the District Court, this proceeding is before the undersigned United States Magistrate for all matters, including trial and entry of judgment. Pending before the Court for purposes of this order are:

- the State of Texas' *First Amended Motion for Contempt for Violation of the June 25, 2002, Injunction, and Alternatively for Equitable Declaratory and Injunctive Relief* (doc. #74) and *Motion for Summary Judgment of Contempt and to Enforce the Court's June 25, 2002, Permanent Injunction* (doc. #96); and

- the Alabama Coushatta Tribe of Texas' *Motion for Relief from Judgment* (doc. #76) and *Motion for Summary Judgment* (doc. #99).

## I.    Background

A.    The Original Complaint and Injunction

On November 21, 2001, the Alabama-Coushatta Tribe of Texas ("The Tribe") filed a complaint for declaratory and injunctive relief (doc. #1) against the State of Texas ("The State") and a handful of its officials seeking injunctive and declaratory relief under the provisions of the Ysleta del Sur Pueblo and Alabama-Coushatta Indian Tribes of Texas Restoration Act ("The Restoration Act"), the Indian Gaming Regulatory Act of 1988 ("IGRA"), and case law.  Specifically, the Tribe sought injunctive relief allowing the Tribe to govern gaming activities on its Indian lands, free from interference.  In the original complaint, the Tribe cited the imminent threat presented by Texas potentially interfering in the Tribe's exercise of its sovereign and statutory rights to offer certain gaming activities on Tribal lands.  The Tribe also cited background information about its circumstances at the time, including a 46% unemployment rate, poor health conditions, and a median household income for the Tribe of $10,809.  *See Complaint* (doc. #1), at p. 6.  The Tribe stated that it is responsible for stewardship of its 4,593 acre Reservation, the external boundaries of which fall within Polk County, Texas.  The land lies in the Big Thicket area and is generally unsuitable for raising crops or cattle.  The Tribe claims that it was wrongfully dispossessed of over two million acres of its original Reservation, but acknowledges that it was seeking a declaration of its rights only regarding the current acreage held by the United States in trust for the benefit of the Tribe. The complaint goes on to explain the background regarding the Restoration Act of 1987 and the resulting sovereign authority of federally recognized tribes to govern gaming activities.

By means of the Restoration Act of 1987, Indian tribes were restored to federally recognized status.  Through the Restoration Act, all rights or privileges lost to the tribes under the Termination

Act of 1954, codified in Title 25, United States Code, were restored to the tribes, including the tribes' authority to manage their own affairs, govern themselves, regulate internal matters and substantive law, and have territorial boundaries. *See Complaint* (doc. #1), at ¶17. In this case, the Tribe avers that certain members of Congress threatened to block passage of the Restoration Act unless the Tribe agreed to language which would forever prevent it from engaging in gaming activities on its lands. *Id.* at ¶18. The Tribe claims that under duress, it was coerced into passing a tribal resolution supporting such language, which if passed into law, would have precluded gaming. *Id.* Congress passed the governing Restoration Act in 1987, and the Tribe's Resolution was incorporated into the Act. *See* 25 U.S.C.S. § 737(a)[1] (LexisNexis 2010 & Supp. 2017).

The complaint also discussed the United States Supreme Court's decision *in California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which the Tribe contends should be applied to Texas public policy to allow for the Tribe to have sovereign and inherent authority over its gaming activities. *See Complaint*, at ¶19-21. In 1999, the General Council for the Tribe voted for the Tribe to offer gaming activities as a source to generate badly-needed tribal government revenues. *Id.* at ¶23. The Tribe constructed and opened an Entertainment Facility for members of the Tribe's private gaming club. *Id.* at ¶24. The Entertainment Facility maintained a number of gaming devices, including random number generators, electronic ticket dispensers, electronic pull tabs, spinning reel

---

[1]In the course of researching the Restoration Act, the Court discovered that the publishers of the United States Code Service (LexisNexis) and United States Code Annotated (West) opted to omit the statutory language of the relevant Restoration Act provisions found in Title 25 from their respective publications. The Restoration Act is, however, still in effect and the full authoritative source can be found at Pub. L. No. 100-89, 101 Stat. 666 (August 18, 1987). For the sake of efficiency and consistency, the Court will cite the provisions found in Title 25 of the United States Code Service (LexisNexis 2010 & Supp. 2017) because that publication still includes the statutory language and because all relevant documents in this case to date cite the Restoration Act as codified in Title 25.

slots, and video lottery devices. *Id.* The Tribe cited a number of other gaming activities that are protected in Texas, including the State Lottery, a horse racing industry, an extensive "slot parlor" market, charitable carnival or casino nights, high-stakes bingo, raffles, casino cruises. *Id.* at ¶26. The Tribe also claimed that the State had embraced a policy of "willful blindness" when it came to non-enforcement as thousands of "eight-liner" games were being used in hundreds of establishments throughout Texas, despite the State's official policy against allowing such private, non-governmental "lottery" games. *Id.* at ¶27. The complaint notes that the Texas State Lottery and Texas State Horse Racing Commission have the regulatory/discretionary authority over gambling/gaming devices. *Id.* at ¶28. In conclusion, the Tribe filed their initial complaint seeking a declaration and injunctive relief from the court permitting it to possess authority to regulate gaming activities on its own Indian lands and to authorize and regulate forms of gaming on its own lands. *See id.* at ¶¶35-41.

After the Tribe filed the original complaint, the following course of events ensued. The State filed an answer with a competing motion for injunctive relief. The presiding judge at the time, The Honorable John Hannah, Jr., stayed the case pending a ruling by the United States Court of Appeals for the Fifth Circuit in a related case[2], *Texas v. Yselta del Sur Pueblo.*[3] After the Fifth Circuit handed down its January 17, 2002, order affirming the district court in the *Yselta* case, the Court lifted the

---

[2]The Yselta del Sur Pueblo litigation is relevant for consideration because the Yselta del Sur Pueblo Tribe is the only other Texas tribe subject to the same Restoration Act, enacted on August 18, 1987. *See* 25 U.S.C.S. § 1300g *et seq.* (LexisNexis 2010 & Supp. 2017) and 25 U.S.C.S. § 731 *et seq.* (LexisNexis 2010 & Supp. 2017), Pub. L. No. 100-89, 101 Stat. 666 (August 18, 1987)("An Act to provide for the restoration of the Federal trust relationship and Federal services and assistance to the Yselta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas[.]").

[3]*See State v. Yselta del Sur Pueblo*, No. 01-51129, 31 F. App'x 835, 2002 WL 243274 (5th Cir. 2002)("We affirm the judgment of the district court essentially for the reasons stated in its careful, thorough September 27, 2001, Memorandum Opinion.")(as cited in Judge Hannah's order, *Alabama-Coushatta Tribes of Texas v. Texas*, 208 F. Supp. 2d 670, 674 (E.D. Tex. 2002)).

stay in this case. Judge Hannah then conducted a four (4) day hearing on the requested relief, and issued his findings of fact and memorandum opinion after receiving the parties' post-hearing proposed findings of fact and briefs.

Judge Hannah issued his ruling on June 25, 2002, in a 22-page memorandum opinion and order in which he granted relief to the State of Texas in the form of a permanent injunction (doc. #36), *Alabama-Coushatta Tribes of Texas v. Texas*, 208 F. Supp. 2d 670, 674 (E.D. Tex. 2002). In sum, he held that "the Tribe should be permanently enjoined from operating its casino because (1) under the plain language of the Restoration Act, as codified in Title 25 of the United States Code, Section 737(a), and Texas law the Tribe is prohibited from conducting casino gaming and (2) the Tribe's resolution not to engage in gaming in exchange for restoration of its federal trust status was "incorporated into the Restoration Act." *Id.* at 672. Judge Hannah carefully analyzed governing precedent, including the Restoration Act and its history, the Fifth Circuit's decision in *Yselta del Sur Pueblo v. State of Tex.*, 36 F.3d 1235, *cert. denied* 514 U.S. 1016 (5th Cir. 1994)(*Yselta I*), and the Supreme Court's decision in *Cabazon*. *See id.* at 672-678. He concluded that the Tribe's activities in operating the Entertainment Center (to include gaming activities) violated provisions of the Texas Penal Code which prohibit certain manners of gambling and that the Entertainment Center was a public nuisance under law. *See id.* at 678-79 (citing the applicable versions of TEX. PENAL CODE §§ 47.02-47.04 and TEX. CIV. PRAC. & REM. CODE §§ 125.001 and 125.041(1))[4](governing common and public nuisances as defined by Texas Penal Code)). Based on this conclusion, and after

_____

[4]The Texas Legislature repealed Section 125.041 of the Texas Civil Practice & Remedies Code in 2003. *See* Acts of 2003, 78th Leg., ch. 1202, § 14. The current provision defining a common nuisance predicated on gambling is found in Section 125.0015. *See* TEX. CIV. PRAC. & REM. CODE. ANN. § 125.0015(a)(5)(West. Supp. 2017).

weighing the appropriate factors to consider before issuing injunctive relief, Judge Hannah ordered the Tribe to cease and desist in operating its gaming and gambling activities on the Tribe's reservation which violate state law. *Id.* at 682.

On July 17, 2002, Judge Hannah entered final judgment and denied the Tribe's request to stay his ruling pending appeal (doc. #47, doc. #48). On September 11, 2002, while the appeal was pending, he also granted the State's request for an award of attorney's fees and awarded $62,828.50 in attorneys' fees and $3,816.00 in non-taxable litigation expenses to the State as the prevailing party pursuant to the Texas Civil Practice and Remedies Code. *See Order* (doc. #52).

On April 16, 2003, the Fifth Circuit issued a per curiam opinion in which a three-judge panel upheld Judge Hannah's decision. *See* Fifth Circuit Order (doc. #53), 66 F. App'x 525 (5th Cir. 2003). The Fifth Circuit concluded that it was bound by *Yselta I* and further noted that "[h]owever sympathetic we may be to the Tribe's argument, we may not reconsider *Yselta*, even if we believed that the case was wrongly decided." *Id.* at p. 4. The Court went on to conclude that "[j]ust as the district court concluded, we are bound by the determination that the Restoration Act precludes the Yselta del Sur Pueblo and the Alabama Coushatta tribes from conducting all gaming activities prohibited by Texas Law on tribal lands." *Id.*

The United States Supreme Court denied the Tribe's petition for writ of certiorari on October 6, 2003. *See Letter* (doc. #55), 540 U.S. 882 (2003). The Clerk then shipped the case to the Federal Records Center in 2004, and Judge Hannah's injunction and judgment remained in place for over thirteen years, with no activity in the case until filings in 2016, as discussed below.

B.     Developments After Judge Hannah's Injunction

In 2015, the Tribe sought guidance from the National Indian Gaming Commission (NIGC)[5]

regarding the Tribe's Resolution No. 2015-038, adopted by the Tribe as a Class II gaming ordinance.

*See October 8, 2015, letter from NIGC to Tribe* ("NIGC letter"), *Exhibit A to Tribe's Motion for*

*Relief from Judgment* (doc. #76-1).   The NIGC issued its responsive letter on October 8, 2015, in

which the NIGC considered whether the Tribe's lands are eligible for gaming.   *Id.*   The NIGC

considered the Restoration Act and IGRA.   *Id.*   The NIGC noted that a similar question regarding

the Yselta del Sur Pueblo's gaming ordinance arose and that the same jurisdictional analysis applies

to the Alabama Coushatta because they are governed by nearly identical language under the

Restoration Act.

The NIGC found that IGRA[6] applied to the Tribe, thus bringing the Tribe within the NIGC's

jurisdiction.   *Id.*   Accordingly, the NIGC further determined that the Tribe's lands were eligible for

gaming under IGRA.   *Id.*   Relatedly, the NIGC concluded that the Restoration Act did not bar the

Tribe from conducting gaming on its lands pursuant to IGRA.   *Id.*

According to the Tribe, it began development of its Naskila Entertainment Center ("Naskila")

to establish a Class II gaming center for operating electronic bingo gaming on its lands.   *See Motion*

*for Relief* (doc. #76), at p. 6.   The Tribe notified the State about Naskila, and, after negotiations with

the Tribe, the State in turn agreed to permit the Tribe to operate Naskila pending the Court's ultimate

determination of the impact of the NIGC's agency decision as it relates to the injunction in this case

---

[5]In IGRA, Congress established the NIGC within the Department of the Interior as a three member commission to monitor gaming conducted on Indian lands and approve related tribal resolutions and ordinances  *See* 25 U.S.C.S. §§ 2704-2707 (LexisNexis 2015).

[6] 25 U.S.C.S. §§ 2701–2721 (LexisNexis 2015)

and, if necessary, whether the gaming at Naskila qualifies as Class II gaming under IGRA. *Id.*

On June 27, 2016, June 28, 2016, and July 14, 2016, counsel for the parties filed various motions to substitute new attorneys and to realign the parties for purposes of the case style, which the Court granted. *See Orders* (doc. #69, doc. #71). The docket activity prompted the Clerk to reassign the case to the docket of United States District Judge Michael H. Schneider, as Judge Hannah passed away in 2003. On August 3, 2016, Judge Schneider in turn referred the proceeding to the undersigned United States Magistrate Judge for recommended disposition. *See Order* (doc. #67). On September 13, 2016, the case was reassigned to Chief United States District Judge Ron Clark upon Judge Schneider's retirement. Finally, the parties consented to the undersigned magistrate judge for all matters, including trial and entry of judgment pursuant to 28 U.S.C. § 636(c), and Judge Clark entered his corresponding *Order of Reference* (doc. #82) on November 7, 2016.

The parties then jointly requested the entry of a scheduling order setting out certain deadlines. The Court issued scheduling orders (doc. #73, doc. #91) culminating in a motion hearing held before the undersigned on May 11, 2017. *See Minute Entry* (doc. #113), *Transcript* (doc. #115). At the hearing, the parties focused primarily on the legal issues at stake in their competing motions. The Court then took the matter under advisement with this opinion to follow. In the interim, the undersigned reset a bench trial before the Court a number of times pending the Court's ruling, the most current bench trial setting being scheduled for February 28, 2018. *See Fifth Amended Scheduling and Discovery Order* (doc. #124).

C.     The Parties' Motions and Competing Arguments

The State initiated the most recent contempt proceedings after the Tribe, through its attorneys, gave the State advance notice of its intent to open Naskila in May or June 2016.  *See First Amended Motion for Contempt* (doc. # 74), at p. 5.  As referenced above, in May 2016, the State and the Tribe entered into a "Pre-Litigation Agreement" requiring notice of opening and allowing a physical inspection of the Naskila premises by the State to determine whether the gaming devices were operating in violation of Texas law, and therefore in violation of federalized law under the Restoration Act.  *Id.*  Naskila, operated by the Tribe, made a "soft" opening on May 16, 2016, then reopened at 12:00 pm on May 17, 2016, and has reportedly remained open since that time.  *Id.*  A "grand opening" for Naskila was then held on June 2, 2016.  *Id.*

On June 15, 2016, the State conducted a physical inspection of Naskila.  Based on the inspection conducted by Captain Daniel Guajardo, the State contends that hundreds of gambling devices were employed at Naskila at 540 State Park Road 56, Livingston, Texas.  *Id.  See also Declaration of Captain Daniel Guajardo, Exhibit 2 to First Amended Motion for Contempt* (doc. #74-3).  Captain Guajardo states that on the date of inspection, he personally inserted cash directly into one of the gambling devices, observed six different computer servers from different vendors to generate chance, and pushed a single button to play an electronic "bingo" game which yielded a cash prize by voucher.  *Id.*  The State contends this "payment of cash consideration into a game of chance which produces cash prizes is an illegal lottery as defined by Texas Penal Code § 47.01."  *See Guajardo Affidavit*, at ¶6.  It also contends that operation of electric bingo as a lottery could constitute a violation of Sections 47.02 (gambling), 47.03(a)(1) and (a)(5) (operating a gambling place or promoting gambling), 47.04(a) (keeping of a gambling place), and 47.06(a) and (c)

(possession, manufacture or transfer of gambling device or gambling paraphernalia).  *See id.*; *see also* TEX. PENAL CODE ANN. §§ 47.02, 47.03 47.04, 47.06 (West 2011 & Supp. 2017).

Based on these alleged gambling violations of the Texas Penal Code, the State contends that the Tribe is violating Judge Hannah's 2002 injunction.  *See First Amended Motion for Contempt*, at p. 7.  The State also seeks declaratory relief through a finding that IGRA does not apply to the Tribe because IGRA did not repeal the Restoration Act, and, accordingly, that as a Restoration Act Tribe, the Alabama-Coushatta Tribe of Texas may not conduct Class II IGRA gaming on its lands. *Id.*

The Tribe in turn filed its Motion for Relief from Judgment, which the Court construes as the companion motion filed in response to the State's motion for contempt.   The Tribe argues that the NIGC's determination is entitled to deference under *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837 (1984).  *See Motion for Relief*, at pp. 6-7.  The Tribe further contends that the NIGC's decision is a reasonable interpretation of IGRA and the Restoration Act.  *Id.*  at p. 10.  The Tribe relatedly argues that IGRA's text and history, along with the subsequent applicable case law, support the NIGC's decision.  *Id.* at 12-16.  Accordingly, the Tribe contends that the Court should defer to the NIGC's determination and dissolve the 2002 injunction.  *Id.*  at pp. 16, 19-20.

The Tribe also avers that the Fifth Circuit's decision in *Yselta I* is distinguishable from the issues before the Court here because it was not a decision about the text of IGRA.  *Id.*  at p. 17 (citing *Yselta I,* 36 F.3d at 1329-31).  It argues that the NIGC's decision is an agency decision constituting a significant change in law providing the Court the authority to relieve the Tribe of the injunction's prospective effects.  *Id.*  at p. 18.  The Tribe further contends that, if the Restoration Act does in fact control, it can continue to offer Class II bingo free from State oversight.

The State's motion for contempt requests that the Court order the Tribe to show cause as to whether the Tribe violated Judge Hannah's injunction by conducting Class II gaming at Naskila. *See First Amended Motion for Contempt*, at p. 12. The contempt finding would necessarily require an evidentiary hearing about the activities at Naskila as well as any civil contempt penalties, but is dependent upon the Court's determination of the preliminary issue regarding the application of the Restoration Act versus IGRA.

On February 8, 2017, the parties also filed competing motions for summary judgment pursuant to an agreed briefing schedule. The State's motion for summary judgment reasserts its position that the Restoration Act applies to the Tribe, thus prohibiting gaming on the Tribe's lands. *See State's Motion for Summary Judgment of Contempt* (doc. #96), at pp. 13-14. Predicated on a finding to this effect, the State next argues that the second issue for resolution is whether the Tribe's current gaming activities violate the Texas Penal Code's prohibition on gambling. *See id.* at p. 14.

The Tribe's *Motion for Partial Summary Judgment* (doc. #99) again argues that IGRA, not the Restoration Act, governs the gaming activities conducted on the Tribe's land. *See Motion* (doc. #99), at p. 1. The Tribe also argues that under IGRA, state law is inapplicable to the operation of Class II gaming and that the electronic bingo games conducted at Naskila constitutes Class II gaming rather than Class III gaming, contrary to the State's contention that the Tribe is in fact conducting Class III gaming. *See id.* at pp. 1, 9-13.

D.      Issues for Consideration

As referenced in the parties' briefs, the Court is tasked with determining two principal questions:

First, does IGRA, 25 U.S.C. 2701 *et seq.*, apply to the Tribe, as the NIGC's October 2015

letter concluded, or does the Tribe's Restoration Act control, 25 U.S.C. §§ 731–737, as the State argues?

Second, if IGRA controls, do the operations at Naskila consist of "Class II" gaming?

Both parties submit evidentiary support for their competing positions on the second issue - whether the Tribe is conducting Class II or Class III gaming on its lands. In the Court's view, however, this evidentiary dispute need not be reached until the Court makes its determination on whether the Restoration Act or IGRA applies. This is because, as discussed herein, the application of the Restoration Act would govern all gaming under Texas law, whether Class II or Class III, perhaps rendering moot any analysis of Class II versus Class III gaming under IGRA. The only remaining issue would be the State's request for contempt, which would require certain evidentiary findings. At the May 11, 2017, motion hearing before the undersigned, the parties agreed that the evidentiary issues regarding the State's contempt request and the classification of the gaming conducted at Naskila would be dependant on the Court's determination of the initial Restoration Act versus IGRA issue. *See Transcript of May 11, 2017, Hearing* (doc. #115), at 40:20-41:23.[7] The parties also indicated that they were amenable to taking up the evidentiary issues related to the State's contempt motion and the enforcement of the 2002 injunction, if necessary, at an evidentiary hearing at a later date. *See id.* at 41:25-43:6.

---

[7]"MR. ABRAMS:"... if
the court concludes that the Restoration Act applies, there would need to be a hearing --
THE COURT: Sure.
MR. ABRAMS: -- at which the parties offer evidence.
THE COURT: Okay.
MR. ABRAMS: And even if it were on the Class II, Class III issue, there likely would need to be
live evidence about those issues, although, you know, we could determine that.
THE COURT: Okay. You agreed, counsel?
MR. ASHBY: Yes, we agree with that, your Honor." *See* doc. #115, at p. 41.

The parties briefed all issues thoroughly and the Court has read and considered the numerous filings in full. For the sake of brevity, the undersigned will not summarize all of the responses, replies and sur-replies but will refer to them as necessary below. The Court appreciates the parties' detailed framing of all of the pertinent issues. However, given the procedural posture of the case and the parties' discussion on the record at the motion hearing, the undersigned finds it appropriate to focus the Court's analysis on the initial legal issue of whether the Restoration Act or IGRA applies to the Tribe's situation at hand. The Court will accordingly defer the questions of the Tribe's alleged contempt and the gaming classifications until after the undersigned makes the underlying legal determination and the parties have the opportunity to present their evidence on the secondary issues as needed.

## II.    Discussion

### A.    Standard of Review

In their motions, the parties request declaratory relief in the form of a legal conclusion by the Court on the issue of the Restoration Act's continued applicability and the impact, if any, of IGRA and the NIGC's recent opinion. The Court will accordingly consider this requested relief in the context of summary judgment in a declaratory judgment action.[8]  *See, e.g., Northfield Ins. Co. v.*

---

[8]28 U.S.C. 2201(a) provides that "[i]n a case of actual controversy within its jurisdiction . . .any court of the United States. . .may declare the rights and other legal relations of any interested party seeking such declarations, whether or not further relief is or could be sought."  28 U.S.C.A. § 2201(a)(Westlaw through Pub. L. No.115-90).  Section 2201 is only a procedural provision that extends to controversies in the jurisdiction of the federal courts.  *Northfield Ins. Co.*, at 708 (citing *Gaar v. Quirk*, 86 F.3d 451, 453-54 (5th Cir. 1996)).  Therefore, the declaratory judgment must have an independent basis for subject matter jurisdiction.  *Id.*  Citing *Lowe v. Ingalls Shipbuilding, Inc.*, 723 F.2d 1173, 1179 (5th Cir. 1984).  The jurisdictional requirements are met in this case under 28 U.S.C. 1362, which provides that the district courts shall have original jurisdiction over civil actions brought by any Indian tribe, and 28 U.S.C. § 1331 because the matter in controversy arises under federal statutes.  *See* 28 U.S.C.A. §§ 1362, 1331 (Westlaw through Pub. L. No. 115-90); *see also Complaint* (doc. #1), at ¶¶6-8 (jurisdiction) and ¶¶35-41 (Tribe's original claim for declaratory and injunctive relief).

*Rodriguez*, 261 F. Supp. 3d 705, 708 (W.D. Tex. 2017)(applying summary judgment standard of review in declaratory judgment action involving interpretation of CGL insurance policy).

Summary judgment should be granted only if the moving party can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This rule places the initial burden on the moving party to identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548 (1986)(quoting Rule 56); *Stults v. Conoco, Inc.,* 76 F.3d 651, 655-56 (5ᵗʰ Cir. 1996)(citations omitted).

B.     Applicable Statutory Framework

As the undersigned referenced above, two statutes are integral to the history of the case and the Court's decision today:  the Restoration Act and IGRA.  Congress passed the Restoration Act in 1987, thereby restoring the federal trust relationship between the United States and the Tribe.  *See Texas v. Yselta del Sur Pueblo*, No. 99-CV-320-KC, 2016 WL 3039991, at *7 (W.D. Tex. May 27, 2016)(citing *Yselta I*, 36 F.3d at 1329); *see also* 25 U.S.C.S. §§ 731 *et seq.*  (LexisNexis 2010 & Supp. 2017) ("Alabama and Coushatta Indian Tribes of Texas: Restoration of Federal Supervision"). One provision of the Restoration Act states:

> "All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe.  Any violation of the prohibition provided in this subsection shall be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas.  The provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T.C.-86-07[9] which was approved

---

[9]The Tribe's Resolution No. T.C.-86-07 was approved and certified by the Tribal Council on March 10, 1986, and provides that "the Alabama-Coushatta Tribe remains firm in its commitment to prohibit outright any gambling or bingo in any form on its Reservation[;]". . ."the Tribe strongly believes that the controversy over gaming must not be permitted to jeopardize this important legislation[;]" and requesting that the United States Senate and House of Representatives include

and certified on March 10, 1986."

25 U.S.C. § 737(a)(LexisNexis 2010 & Supp. 2017). The Restoration Act also provides that "the courts of the United States shall have exclusive jurisdiction over any offense in violation of subsection (a) that is committed by the tribe, or by any member of the tribe, on the reservation or on the lands of the tribe." *Id.* at § 737(c). "However, nothing in this section shall be construed as precluding the State of Texas from bringing an action in the courts of the United States to enjoin violations of the provisions of this section." *Id.*

Approximately one year after passing the Restoration Act, in 1988 Congress enacted IGRA. IGRA set forth a regulatory system consisting of three classes of gaming with differing degrees of corresponding regulations. *See Texas v. Yselta del Sur Pueblo*, 2016 WL 3039991, at *7; *see also* 25 U.S.C.S. § 2703(6)-(8)(LexisNexis 2015)(defining Class I, Class II and Class III gaming). Congress' intent in passing IGRA was, among other things, to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;" and "to provide a statutory basis for the regulation of gaming by an Indian tribe[.]" 25 U.S.C.S. § 2702(1)-(2) (LexisNexis 2015). IGRA also created the NIGC and charged it with "promulgat[ing] such regulations and guidelines as it deems appropriate to implement the provisions of this Act." 25 U.S.C.S. § 2706(b)(10)(LexisNexis 2015).

---

language in the Act "which would provide that all gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the state of Texas, shall be prohibited on the Tribe's reservation or on Tribal land." *See Alabama-Coushatta Tribes of Tex. v. Texas*, 208 F. Supp. 2d at 673-74 (quoting Alabama-Coushatta Tribal Resolution #86-07).

C.        Analysis of the NIGC's Letter Opinion

(1) *Chevron* Deference Generally

Under the *Chevron* doctrine, "[w]hen a court reviews an agency's construction of the statute which it administers, it is confronted with two questions." *Texas v. Yselta del Sur Pueblo*, at *9 (quoting *City of Arlington v. Fed. Communications Comm'n*., 569 U.S. 290, 133 S. Ct. 1863, 1868 (2013)); *see also Chevron,* 467 U.S. at 842.  First, always, is the question whether Congress has directly spoken to the precise question at issue. *Chevron*, at 842.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. *Id.* at 842-43.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. *Id.* at 843.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Id.*

Additionally, an agency's interpretation of a statute it does not administer is ordinarily not entitled to deference. *Texas v. Yselta del Sur Pueblo*, at *9 (citing *America's Cmty. Bankers v. Fed. Deposit Ins. Corp*., 200 F.3d 822, 833 (D.C. Cir. 2000), *Passamaquoddy Tribe v. Maine*, 75 F.3d 784, 793-94 (1st Cir. 1996)).  The types of interpretations that may qualify for *Chevron* deference include "an agency's interpretation of a statutory ambiguity that concerns the scope of it regulatory authority (that is, its jurisdiction)." *Id.* Quoting *City of Arlington*, 569 U.S. at 293, 133 S. Ct. at 293. "No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the*

*bounds of its authority*."  *City of Arlington*, 569 U.S. at 297 (emphasis in original).

Within the Fifth Circuit, courts are "guided by the two-step analysis" introduced in *United States v. Mead Corp.*, 533 U.S. 218 (2001).  *Texas v. Yselta del Sur Pueblo*, at *10 (citing *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 454 (5th Cir. 2015)).  Administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears (1) that Congress delegated authority to the agency generally to make rules carrying the force of law, and (2) that the agency interpretation claiming deference was promulgated in the exercise of that authority.  *See id.* Quoting *Knapp*, at 454; *see also Mead*, 533 U.S. at 226-27; *City of Arlington*, 569 U.S. at 307; *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005); *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364 (D.C. Cir. 1990)("Where Congress prescribes the form in which an agency may exercise its authority . . .[courts] cannot elevate the goals of an agency's action, however reasonable, over that prescribed form.").

(2)     The Yselta del Sur Pueblo Litigation

Here, the Court takes much guidance from United States District Judge Kathleen Cardone of the Western District of Texas in her most recent ruling on the "protracted" gaming "saga" of the Yselta del Sur Pueblo ("Pueblo Tribe[10]").  *See Texas v. Yselta del Sure Pueblo*, at *2.  She considered many of same issues present here.

In the Pueblo Tribe's case, similar arguments were present regarding the Pueblo Tribe's ongoing attempt to conduct gaming at the Speaking Rock Casino on its tribal lands.  *See id.*  at *3.

_____

[10]The Yselta del Sur Pueblo are referred to as both the "Tigua" and the "Pueblo" in case law and the parties' briefs.  Both designations appear correct historically, but because Judge Cardone's opinion refers to the Yselta del sur Pueblo entities in her case collectively as the "Pueblo Defendants", the Court will follow suit.  *See* YSELTA DEL SUR PUEBLO, http://www.ysletadelsurpueblo.org (last visited February 1, 2018); *Texas v. Yseltsa del Sur Pueblo*, at *1.

17

The Pueblo Tribe's situation is almost identical to that of the Alabama Coushatta's as both tribes were subject to the Restoration Act as explained *infra*. *See id.* at *6. The Pueblo Tribe sought and obtained a letter opinion from the NIGC, dated October 5, 2015,[11] in which the NIGC considered a gaming ordinance and resolution passed by the Pueblo Tribe. *Id.* at *5. The NIGC approved the Pueblo Tribe's ordinance and concluded that the Pueblo Tribe's lands were eligible for gaming under IGRA because they qualify as Indian lands. *Id.* The NIGC's letter also cited to and incorporated a 22-page letter from the Solicitor for Indian Affairs with the Department of Interior (DOI) in support of the finding that IGRA governs gaming on the Pueblo Tribe's reservation and impliedly repealed provisions of the Restoration Act "repugnant to IGRA." *Id.* In sum, the DOI letter concluded that the Restoration Act does not prohibit the Pueblo Tribe from gaming on its Indian lands under IGRA[12]. *Id.* at *6. The DOI letter also opines that the Fifth Circuit's 1994 opinion in *Yselta I* was wrongly decided and, contrary to the Fifth Circuit's holding in that case, that IGRA applies to the Pueblo Tribe's gaming activities. *See id.*

Similar to the Alabama Coushatta Tribe's approach in this case, the Pueblo Tribe relied on the opinion letters from the NIGC and the DOI in arguing that Judge Cardone should vacate the injunction precluding the Pueblo Tribe from conducting gaming on its lands. *See id.* The Pueblo Tribe also relatedly contended that the NIGC and DOI letters should be afforded *Chevron* deference. *Id.*

---

[11]Notably, only three (3) days prior to the NIGC's letter to the Alabama Coushatta in this case.

[12]Based on the record, the DOI did not issue any letter opinion specific to the Alabama-Coushatta's gaming operations, but the NIGC incorporated the DOI's letter from the Yselta del Sur Pueblo's case inro ira findings in its October 8, 2015, letter to the Alabama-Coushatta. *See* doc. #76-1, at p. 2. The DOI letter was also briefly discussed at the May 11, 2017, hearing in the context of *Chevron* deference. *See Transcript* (doc. #115), at 32:21-33:9.

Judge Cardone held that "[w]hile the Pueblo Defendants urge the Court to defer to the NIGC and DOI Letters, the Court does not afford the Letters *Chevron* deference because there is no indication that Congress intended for courts to defer to NIGC and DOI interpretations of anything beyond the respective statutes each agency administers." *Id.* at *10. She explained as follows:

> "IGRA established the NIGC as an entity within the DOI, and charged it with administering IGRA. *See* 25 U.S.C. §§ 2704(a), 2706(b)(10) (charging NIGC with, among other things, "promulgat[ing] such regulations and guidelines as it deems appropriate to implement the provisions of this chapter"). Likewise, DOI is charged with, among other responsibilities, administering the Restoration Act. *See* Restoration Act, Pub. L. No. 100-89, § 2, 101 Stat. 666 ("The Secretary of the Interior or his designated representative may promulgate such regulations as may be necessary to carry out the provisions of this Act."). Thus, NIGC's interpretations of the provisions of IGRA, and DOI's interpretations of the provisions of the Restoration Act, are interpretations potentially within the scope of agency pronouncements accorded *Chevron* deference. *See City of Arlington*, 135 S. Ct. at 1866. Yet, the NIGC and DOI Letters interpret not only the agencies' respective organic statutes, but also the interplay of their organic statutes with other statutes and case law. *See generally* Agency Letters. *Therefore, the Court does not defer to the contents of the NIGC and DOI Letters because an agency's interpretation of a statute it does not administer is ordinarily not entitled to deference. See* Am.'s Cmty. Bankers, 200 F.3d at 833; Passamaquoddy, 75 F.3d at 793-94.

*Id.* at *10 (emphasis added).

    (3)    Application

This Court faces a similar situation here. The letter from the NIGC to the Tribe grounds its content in analysis of both IGRA and the Restoration Act, along with federal regulations promulgated under IGRA. *See NIGC Letter* (doc. #76-1), *see also Texas v. Yselta del Sur Pueblo*, at *11. The NIGC letter to the Trive interprets the Restoration Act: "the Restoration Act must be taken into consideration as part of this ordinance review;" "we must first examine. . . whether the Tribe's Restoration Act lands are exempt from IGRA's domain." *See NIGC Letter*, at p. 2. Although IGRA does specifically task the NIGC with enforcing and interpreting IGRA as noted above, there is no indication that Congress delegated similar authority to IGRA to do the same for the Restoration

Act.  The NIGC  also relies on the DOI letter at issue in the Yselta del Sur Pueblo case and notes that "because the Tribe and Pueblo share the same Restoration Act, with nearly identical language, that same jurisdictional analysis applies to the Alabama-Coushatta's portion of the Restoration Act." *Id..* The NIGC letter to the Tribe further relies on the DOI letter for the conclusion that "IGRA impliedly repeals the portions repugnant to IGRA." *Id.*  Therefore, the NIGC's opinion at issue here is dependant upon the very same analysis employed by the NIGC and the DOI in the Pueblo Tribe's case, to which Judge Cardone declined to afford *Chevron* deference.  The Court is unpersuaded that the NIGC's opinion in this case is distinguishable to the extent that it is entitled to deference.  In fact, it relies on identical analysis to that employed by the NIGC and the DOI in the Pueblo case.

Like Judge Cardone, this Court "cannot take it upon itself to assume, without any evidence, that Congress intended to entrust the NIGC with reconciling IGRA and the Restoration Act." *See Texas v. Yselta del Sur Pueblo*, at *10 (internal quotations omitted).  Thus, the undersigned must also conclude that the NIGC's letter to the Tribe and findings therein do not merit *Chevron* deference on this basis.  *Id.*

Judge Cardone further concluded that to the extent the Pueblo Tribe asked her to "defer to the NIGC's…conclusion that IGRA impliedly repealed the Restoration Act, the *Chevron* framework remains untenable." *Id.*  at *11.  Whether IGRA impliedly repealed the Restoration Act is "a pure question of statutory construction for the courts to decide," and not an issue that appears to "implicate [ ] agency expertise in a meaningful way." *Id.*  Quoting *Immigration and Naturalization Serv. v. Cardoza-Fonseca*, 480 U.S.421,  446-47 (1987) and  *Drakes v. Zimski*, 240 F.3d 246, 250 (3rd Cir.), *cert. denied* 540 U.S. 1008 (2003).  Judge Cardone concluded that the court should not defer to the NIGC's and DOI's respective interpretations of the interplay among several statutes and

case law . *Id.* at \*11. Despite the Tribe's arguments to the contrary, addressed *infra*, the undersigned is not persuaded that this case should yield a different result and accordingly concludes that the agency letter did not in effect repeal the Restoration Act governing the Alabama Coushatta.

At the hearing in this matter, the Tribe argued that in *City of Arlington*, the Supreme Court rejected the *Chevron* deference analysis employed in Judge Cardone's opinion. *See Transcript*, at p. 29. In *City of Arlington*, the United States Supreme Court considered "whether a court must defer under *Chevron* to an agency's interpretation of a statutory ambiguity that concerns the scope of the agency's statutory authority (that is, jurisdiction)." City *of Arlington*, 569 U.S. at 296-97. After explaining the "jurisdictional" issue for Chevron purposes, Justice Scalia stated that once the labels of jurisdictional and nonjurisdictional are "sheared away, it becomes clear that the question in every case is, simply, whether the statutory text forecloses the agency asserted authority, or not." *Id.* at 301 (internal quotation omitted).

The Tribe avers that the NIGC's decision reflects a judgment regarding the scope of its own authority - its regulatory jurisdiction - and, therefore, that it is unequivocally entitled to *Chevron* deference under *City of Arlington*. *See Motion for Relief*, at p. 8. The Court concurs that the NIGC has the authority to administer and regulate Indian gaming laws because that authority is provided by IGRA. *See* 25 U.S.C.S. §§ 2705, 2710 (LexisNexis 2015). What the Tribe has not accounted for, however, is the gap between the authority granted to IGRA under the NIGC and the provisions of the Restoration Act, which the NIGC does not have the statutory authority to interpret or regulate. The Tribe attempts to explain this away by contending that the Restoration Act is a "contingent, general regulation" of all gaming on some Indian lands and not a "specific prohibition" of gaming on Indian lands and, therefore, IGRA, rather than the Restoration Act, applies to the Tribe. *See id.*

at p. 11. This exercise in "specific" versus "general" statutory construction is unpersuasive. The fact remains that the Restoration Act speaks directly to gaming by the Tribe. *See* 25 U.S.C.S. § 737(a) (LexisNexis 2010 & Supp. 2017). The Fifth Circuit determined that the Restoration Act's provisions on gaming apply to Restoration Act tribes - including the Alabama-Coushatta - and concluded that it, not IGRA governs gaming by the Tribe. *See Yselta I*, at 1336. It continues to uphold this determination as the tribes present new challenges to the prohibition on gaming. *See, e.g, id*; *Tex. v. Yselta del Sur Pueblo*, 69 F. App'x 659 (5th Cir.), *cert. denied*, 540 U.S. 985 (2003); *Tex. v. Yselta del Sur Pueblo*, 431 F. App'x 326 (5th Cir. 2011); *Alabama Coushatta Tribe of Tex. v. Tex.*, 66 F. App'x 525 (5th Cir.), *cert. denied* 540 U.S. 882 (2003).

The *City of Arlington* analysis does not require a different conclusion, as argued by the Tribe. *City of Arlington* speaks to the scope of an agency's delegated statutory authority and its application of that authority. *See City of Arlington*, 569 U.S. at 300. It further stands for the proposition that "*Chevron* [deference] applies to cases in which an agency adopts a construction of a jurisdictional provision of a statute it administers." *Id.* at 301. Judge Cardone's analysis did not run afoul of this deference because she rightly considered the issue of NIGC's authority - or lack thereof - under the Restoration Act, not IGRA, from which it derives its statutory authority. The Court concludes that the *City of Arlington* in fact supports both Judge Cardone's decision and the conclusion that the undersigned must reach herein. *City of Arlington* dealt with a federal agency - the FCC - which relied on its broad authority to implement the Communications Act when it issued a Declaratory Ruling setting a 90 day period for state and local governments to process applications for wireless facilities. *Id.* at 294-95. In that case, the Communications Act specifically empowered the FCC with broad authority to prescribe rules and regulations to carry out the provisions of the

Communications Act. *See id.* at 293; 47 U.S.C.A. § 201 (Westlaw through Pub. L. No. 115-90). No such provision delegating this broad authority to IGRA is available in the Restoration Act, and the law remains that the Restoration Act, not IGRA, applies to the Tribe. For these reasons, the Court overrules the Tribe's reliance on *City of Arlington* for the proposition that it somehow "rejected" the governing law in this case.

The Tribe relatedly argues that the NIGC's opinion regarding the Tribe's gaming ordinance, along with *City of Arlington* and *Brand X*,[13] constitute a change in controlling law which would support the Court (1) giving deference to the NIGC decision and (2) dissolving the 2002 injunction. Again, this line of reasoning is flawed because it presumes that the NIGC has the authority to interpret the Restoration Act in the first place, which it does not. The Tribe has not established that Congress intended for the NIGC to interpret the Restoration Act or promulgate regulations pursuant to the Restoration Act. As discussed above, the NIGC's authority flows from IGRA, not the Restoration Act.

(D) The Fifth Circuit's Decision in *Yselta I*: Binding Precedent

Finally, the Court also agrees with Judge Cardone in concluding that the undersigned is bound by the Fifth Circuit's decision in *Yselta I*. *See Texas v. Yselta del sur Pueblo*, at *14. As noted herein, in *Ysleta I*, the Fifth Circuit analyzed the interplay between the Restoration Act and IGRA, as applied to the Pueblo Tribe. *Yselta I*, 36 F.3d at 1332-37. The court examined the text and

---

[13] *See Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Svcs.*, 545 U.S. 967 (2005). *Brand X* is distinguishable for the same reasons as *City of Arlington*. In *Brand X*, the Supreme Court was also considering an FCC interpretation of the Communications Act of 1934 and the Telecommunications Act of 1996, the very statutes from which its authority flows. *See Brand X*, 545 U.S. 975-76, 983. Again, this is inapplicable to this case because the NIGC's authority does not flow from the Restoration Act, the governing statute.

legislative histories of both acts, and concluded that the Restoration Act, and not IGRA, "would govern the determination of whether gaming activities proposed by the Ysleta del Sur Pueblo are allowed under Texas law, which functions as surrogate federal law." *Id.* at 1335. In reaching this conclusion, the Fifth Circuit found that Congress had spoken to the issue of whether the Restoration Act or IGRA governs gaming on the Tribe's reservation because IGRA did not impliedly repeal the Restoration Act, and because the two statutes establish "fundamentally different regimes." *See id.* at 1334-35. The Fifth Circuit explained:

> "With regard to gaming, the Restoration Act clearly is a specific statute, whereas IGRA is a general one. The former applies to two specifically named Indian tribes located in one particular state, and the latter applies to all tribes nationwide. Congress, when enacting IGRA less than one year after the Restoration Act, explicitly stated in two separate provisions of IGRA that *IGRA should be considered in light of other federal law. Congress never indicated in IGRA that it was expressly repealing the Restoration Act.* Congress also did not include in IGRA a blanket repealer clause as to other laws in conflict with IGRA. Finally, we note that in 1993, Congress expressly stated that IGRA is *not* applicable to one Indian tribe in South Carolina, evidencing in our view a clear intention on Congress' part that IGRA is not to be the one and only statute addressing the subject of gaming on Indian lands.

*Id.* at 1335 (footnotes omitted; emphasis added).

Thus, the Fifth Circuit identified a congressional intent that IGRA did not repeal the Restoration Act and that therefore the Restoration Act — and not IGRA — applies to the Tribe's gaming activity. *Texas v. Yselta del Sur Pueblo*, at *14 (citing *Yselta I*, at 1334-35). This Court is bound by Fifth Circuit precedent on this issue and, therefore, is not inclined to hold otherwise. *See id. See also Law v. Hunt Co., Tex.*, 830 F. Supp. 2d 211, 216 (N.D. Tex. 2011)("this court will not deviate from Fifth Circuit precedent unless there are clear legal grounds to do so.")[14] Accordingly,

---

[14]In its briefs, the Tribe cites a number of decisions from other Circuits in support of the NIGC's opinion and its applicability here. *See, e.g., Commonwealth of Mass. v. Wampanoag Tribe of Gay Head (Aquinnah)*, 853 F.3d 618 (1st Cir. 2017), *cert. denied* __S. Ct. __, 2018 WL 311322 (Jan. 8, 2018); *State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685 (1st Cir. 1994), *cert. denied* 513 U.S. 919 (1994);

the Restoration Act, and not IGRA, applies in this case. *See id.* Texas law governing gaming, specifically the Texas Penal Code, accordingly applies to the Tribe's gaming operations on its lands.

### III. Concluding Statements and Order of the Court

Given the complex history of this matter and its importance to the Tribe, the undersigned must take the time to express the Court's understanding and sympathy for the Tribe's position. The Tribe is bearing the brunt of a conflicting statutory scheme, the result of which is arguably undesirable to its interests and, many would say, unjust. Counsel for both sides have done a thorough and excellent job in advocating for their clients and presenting the best case possible, especially given the context and the complicated historical, legal, social and economic issues at stake. The fact remains, however, that the Tribe submitted itself to the gaming laws of the State when it certified Tribal Resolution No. T.C. -86-07 in exchange for passage of the Restoration Act. This may have indeed taken effect under duress, but that issue is not up for consideration by this Court thirty years after the fact. The plain language of the Restoration Act stands, as does the Fifth Circuit's undisturbed interpretation of the application of that Act to the restoration tribes of Texas. Until Congress can be persuaded to amend or repeal the Restoration Act, the Court is obligated to abide by the plain language of the statute and the Tribe must conform to the gaming laws and regulations of Texas as provided by the Restoration Act. *See Tex. v. Yselta del Sur Pueblo*, 431 App'x 326, 327 (5th Cir. 2011)(per curiam), *citing Yselta I*, at 1335.

---

*City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 702 F.3d 1147 (8th Cir. 2013); *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536 (8th Cir. 1996). Although those opinions may bolster the Tribe's position, they are insufficient to support a deviation from standing Fifth Circuit precedent without clear legal grounds to do so. *See, e.g., Law*, 830 F. Supp. 2d at 216. Until the Fifth Circuit reverses itself or the Supreme Court clearly holds to the contrary, this Court must follow and apply the Fifth Circuit's determinations set forth in *Yselta I*.

Based on the findings legal conclusions stated herein, the Court therefore **ORDERS** as follows:

-the State of Texas' *Amended First Motion for Contempt for Violation of the June 25, 2002, Injunction, and Alternatively for Equitable Declaratory and Injunctive Relief* (doc. #74) and *Motion for Summary Judgment of Contempt and to Enforce the Court's June 25, 2002, Permanent Injunction* (doc. #96) are **GRANTED IN PART**.  Those motions are granted with respect to the State's request for a declaration from the Court that the Restoration Act and, consequently, Texas law, applies to the Tribe's gaming activities.  At this time, the Court defers ruling on the State's other requests for relief regarding contempt findings and damages.

The Court further **ORDERS** that the Tribe's *Motion for Relief from Judgment* (doc. #76) and *Motion for Partial Summary Judgment* (doc. #99) are **DENIED**.

Having concluded that the Restoration Act applies, the Court finds it unnecessary to reach the question of whether the activities conducted at Naskila constitute Class II or Class III gaming under IGRA at this juncture.  To the extent that the parties' motions seek relief on this issue, that relief is denied as moot, without prejudice to reassert.  As indicated above, the Court further defers any finding on the State's contempt allegations and corresponding request for damages and fees until after conducting  a hearing and making proper evidentiary findings.

It is so ordered.

**SIGNED this the 6th day of February, 2018.**


_____
KEITH F. GIBLIN
UNITED STATES MAGISTRATE JUDGE