

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION**

| | | |
|---|---|---|
| **STATE OF TEXAS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 9:01-CV-299** |
| | § | |
| **ALABAMA COUSHATTA TRIBE** | § | |
| **OF TEXAS,** | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW
ON THE STATE'S MOTION FOR CONTEMPT**

Pursuant to 28 U.S.C. § 636(c), the Local Rules for the United States District Court for the

Eastern District of Texas, and order of the District Court, this proceeding is before the undersigned

United States Magistrate for all matters, including trial and entry of judgment.  Pending before the

Court is the State of Texas' Second *Amended Motion for Contempt and Motion for Order to Show

Cause* (doc. #160).  On May 17-18, 2021, the undersigned conducted a bench trial and evidentiary

hearing on the issues presented in the State's motion.  *See* Transcript, Vol. 1 and Vol. 2 (doc. #184,

doc. #185).  The Court now enters these findings of fact and conclusions of law after considering

the evidence presented and the parties' competing arguments and briefs.

**I.      Background**

A.      The Original Complaint and Injunction

On November 21, 2001, the Alabama-Coushatta Tribe of Texas ("The Tribe") filed a complaint for declaratory and injunctive relief (doc. #1) against the State of Texas ("The State") and a handful of its officials seeking injunctive and declaratory relief under the provisions of the Ysleta del Sur Pueblo and Alabama-Coushatta Indian Tribes of Texas Restoration Act ("The Restoration Act"), the Indian Gaming Regulatory Act of 1988 ("IGRA"), and case law. Specifically, the Tribe sought injunctive relief allowing the Tribe to govern gaming activities on its Indian lands, free from interference.  In the original complaint, the Tribe cited the imminent threat presented by Texas potentially interfering in the Tribe's exercise of its sovereign and statutory rights to offer certain gaming activities on Tribal lands.  The Tribe also cited background information about its circumstances at the time, including a 46% unemployment rate, poor health conditions, and a median household income for the Tribe of $10,809.  *See Complaint* (doc. #1), at p. 6.  The Tribe stated that it is responsible for stewardship of its 4,593 acre reservation, the external boundaries of which fall within Polk County, Texas.  The land lies in the Big Thicket area and is generally unsuitable for raising crops or cattle.  The Tribe claims that it was wrongfully dispossessed of over two million acres of its original reservation but acknowledges that it was seeking a declaration of its rights only regarding the current acreage held by the United States in trust for the benefit of the Tribe. The complaint goes on to explain the background regarding the Restoration Act of 1987 and the resulting sovereign authority of federally recognized tribes to govern gaming activities.

By means of the Restoration Act of 1987, Indian tribes were restored to federally recognized status.  Through the Restoration Act, all rights or privileges lost to the tribes under the Termination Act of 1954, codified in Title 25, United States Code, were restored to the tribes, including the tribes' authority to manage their own affairs, govern themselves, regulate internal matters and substantive law, and have territorial boundaries.  *See Complaint* (doc. #1), at ¶17.  In this case, the Tribe argued that certain members of Congress threatened to block passage of the Restoration Act unless the Tribe agreed to language which would forever prevent it from engaging in gaming activities on its lands.  *Id.*  at ¶18.  The Tribe claims that under duress, it was coerced into passing a tribal resolution (T.C.-86-07) supporting such language, which if passed into law, would have precluded gaming.  *Id.*  Congress passed the governing Restoration Act in 1987, and the Tribe's resolution was incorporated into the Act.  *See* 25 U.S.C.S. § 737(a)[1] (LexisNexis), 100 P.L. 89, 101 Stat. 666 (Aug. 18, 1987).  The Court will address the pertinent provisions of the Restoration Act in further detail below.

The complaint also discussed the United States Supreme Court's decision *in California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which the Tribe contends should be applied to Texas public policy to allow for the Tribe to have sovereign and inherent authority over its gaming activities.  *See Complaint*, at ¶19-21.  In 1999, the General Council for the Tribe voted for the Tribe to offer gaming activities as a source to generate badly-needed tribal government revenues.  *Id.*  at ¶23.  The Tribe constructed and opened an "Entertainment Facility" for members of the Tribe's private gaming club.  *Id.*  at ¶24.  The Entertainment Facility maintained a number

---

[1] In the course of researching the Restoration Act, the Court discovered that the publishers of the United States Code Service (LexisNexis) and United States Code Annotated (West) opted to omit the statutory language of the relevant Restoration Act provisions found in Title 25 from their respective publications.  The Restoration Act is, however, still in effect and the full authoritative source can be found at Pub. L. No. 100-89, 101 Stat. 666 (August 18, 1987).

of gaming devices, including random number generators, electronic ticket dispensers, electronic pull tabs, spinning reel slots, and video lottery devices. *Id.* The Tribe cited gaming activities that were protected in Texas at that time, including the State Lottery, a horse racing industry, an extensive "slot parlor" market, charitable carnival or casino nights, high-stakes bingo, raffles, casino cruises. *Id.* at ¶26. The Tribe also claimed that the State had embraced a policy of "willful blindness" when it came to non-enforcement as thousands of "eight-liner" games were being used in hundreds of establishments throughout Texas, despite the State's official policy against allowing such private, non-governmental "lottery" games. *Id.* at ¶27. The complaint notes that the Texas State Lottery and Texas State Horse Racing Commission have the regulatory/discretionary authority over gambling/gaming devices. *Id.* at ¶28. In conclusion, the Tribe filed their initial complaint seeking a declaration and injunctive relief from the court permitting it to possess authority to regulate gaming activities on its own Indian lands and to authorize and regulate forms of gaming on its own lands. *See id.* at ¶¶35-41.

After the Tribe filed the original complaint in November 2001, the following course of events ensued. The State filed an answer with a competing motion for injunctive relief. The presiding judge at the time, The Honorable John Hannah, Jr., stayed the case pending a ruling by the United States Court of Appeals for the Fifth Circuit in a related case[2], *Texas v. Ysleta del Sur*

---

[2] The Ysleta del Sur Pueblo litigation is relevant for consideration because the Ysleta del Sur Pueblo Tribe is the only other Texas tribe subject to the same Restoration Act, enacted on August 18, 1987. *See* 25 U.S.C.S. § 1300g *et seq*. and 25 U.S.C.S. § 731 *et seq*., Pub. L. No. 100-89, 101 Stat. 666-672 (August 18, 1987) ("An Act to provide for the restoration of the Federal trust relationship and Federal services and assistance to the Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas[.]").

*Pueblo.*[3]  After the Fifth Circuit handed down its January 17, 2002, order affirming the district court in the *Yselta* case, the Court lifted the stay in this case.  Judge Hannah then conducted a four (4) day hearing on the requested relief and issued his findings of fact and memorandum opinion after receiving the parties' post-hearing proposed findings of fact and briefs.

Judge Hannah issued his ruling on June 25, 2002, in a 22-page memorandum opinion and order in which he granted relief to the State of Texas in the form of a permanent injunction (doc. #36), *Alabama-Coushatta Tribes of Texas v. Texas*, 208 F. Supp. 2d 670, 674 (E.D. Tex. 2002). In sum, he held that "the Tribe should be permanently enjoined from operating its casino because (1) under the plain language of the Restoration Act, as codified in Title 25 of the United States Code, Section 737(a), and Texas law the Tribe is prohibited from conducting casino gaming and (2) the Tribe's resolution not to engage in gaming in exchange for restoration of its federal trust status was "incorporated into the Restoration Act." *Id.*  at 672.  Judge Hannah carefully analyzed governing precedent, including the Restoration Act and its history, the Fifth Circuit's decision in *Yselta del Sur Pueblo v. State of Tex.*, 36 F.3d 1325, *cert. denied* 514 U.S. 1016 (5th Cir. 1994) (*Yselta I*), and the Supreme Court's decision in *Cabazon*.  *See id.*  at 672-678.  He concluded that the Tribe's activities in operating the Entertainment Center (to include gaming activities) violated provisions of the Texas Penal Code which prohibit certain manners of gambling and that the Entertainment Center was a public nuisance under law.  *See id.*  at 678-79 (citing the applicable versions of TEX. PENAL CODE §§ 47.02-47.04 and TEX. CIV. PRAC. & REM. CODE §§ 125.001 and

---

[3] *See State v. Yselta del Sur Pueblo*, No. 01-51129, 31 F. App'x 835, 2002 WL 243274 (5th Cir. 2002) ("We affirm the judgment of the district court essentially for the reasons stated in its careful, thorough September 27, 2001, Memorandum Opinion.") (as cited in Judge Hannah's order, *Alabama-Coushatta Tribes of Texas v. Texas*, 208 F. Supp. 2d 670, 674 (E.D. Tex. 2002)).

125.041(1))[4] (governing common and public nuisances as defined by Texas Penal Code)).  Based on this conclusion, and after weighing the appropriate factors to consider before issuing injunctive relief, Judge Hannah ordered the Tribe to cease and desist in operating its gaming and gambling activities on the Tribe's reservation which violate state law.  *Id.*  at 682.

On July 17, 2002, Judge Hannah entered final judgment and denied the Tribe's request to stay his ruling pending appeal (doc. #47, doc. #48).  On September 11, 2002, while the appeal was pending, he also granted the State's request for an award of attorney's fees and awarded $62,828.50 in attorneys' fees and $3,816.00 in non-taxable litigation expenses to the State as the prevailing party pursuant to the Texas Civil Practice and Remedies Code.  *See Order* (doc. #52).

On April 16, 2003, the Fifth Circuit issued a per curiam opinion in which a three-judge panel upheld Judge Hannah's decision.  *See* Fifth Circuit Order (doc. #53), 66 F. App'x 525 (5th Cir. 2003).  The Fifth Circuit concluded that it was bound by *Yselta I* and further noted that "[h]owever sympathetic we may be to the Tribe's argument, we may not reconsider *Yselta*, even if we believed that the case was wrongly decided."  *Id.*  at p. 4.  The Court went on to conclude that "[j]ust as the district court concluded, we are bound by the determination that the Restoration Act precludes the Yselta del Sur Pueblo and the Alabama Coushatta tribes from conducting all gaming activities prohibited by Texas Law on tribal lands."  *Id.*

The United States Supreme Court denied the Tribe's petition for writ of certiorari on October

---

[4] The Texas Legislature repealed Section 125.041 of the Texas Civil Practice & Remedies Code in 2003.  *See* Acts of 2003, 78th Leg., ch. 1202, § 14.  The current provision defining a common nuisance predicated on gambling is found in Section 125.0015.  *See* TEX. CIV. PRAC. & REM. CODE. ANN. § 125.0015(a)(5).

6, 2003.  *See Letter* (doc. #55), 540 U.S. 882 (2003).   The Clerk then shipped the case to the Federal Records Center in 2004, and Judge Hannah's injunction and judgment remained in place for over thirteen years, with no activity in the case until filings in 2016, as discussed below.

B.  Recent Developments After Judge Hannah's Injunction

In 2015, the Tribe sought guidance from the National Indian Gaming Commission (NIGC)[5] regarding the Tribe's Resolution No. 2015-038, adopted by the Tribe as a Class II gaming ordinance. *See October 8, 2015, letter from NIGC to Tribe* ("NIGC letter"), *Exhibit A to Tribe's Motion for Relief from Judgment* (doc. #76-1).   The NIGC issued its responsive letter on October 8, 2015, in which the NIGC considered whether the Tribe's lands are eligible for gaming.  *Id.*  The NIGC considered the Restoration Act and IGRA.  *Id.*  The NIGC noted that a similar question regarding the Yselta del Sur Pueblo's gaming ordinance arose and that the same jurisdictional analysis applies to the Alabama Coushatta because they are governed by nearly identical language under the Restoration Act.

The NIGC found that IGRA[6] applied to the Tribe, thus bringing the Tribe within the NIGC's jurisdiction.  *Id.*  Accordingly, the NIGC further determined that the Tribe's lands were eligible for gaming under IGRA.  *Id.*  Relatedly, the NIGC concluded that the Restoration Act did not bar the Tribe from conducting gaming on its lands pursuant to IGRA.  *Id.*

According to the Tribe, it began development of its Naskila Entertainment Center ("Naskila") to establish a Class II gaming center for operating electronic bingo gaming on its lands. *See Motion for Relief* (doc. #76), at p. 6.  The Tribe notified the State about Naskila, and, after

---

[5] In IGRA, Congress established the NIGC within the Department of the Interior as a three member commission to monitor gaming conducted on Indian lands and approve related tribal resolutions and ordinances.  *See* 25 U.S.C.S. §§ 2704-2707 (LexisNexis).

[6]  25 U.S.C.S. §§ 2701–2721 (LexisNexis)

negotiations with the Tribe, the State in turn agreed to permit the Tribe to operate Naskila pending the Court's ultimate determination of the impact of the NIGC's agency decision as it relates to the injunction in this case and, if necessary, whether the gaming at Naskila qualifies as Class II gaming under IGRA. *Id.*

On June 27, 2016, June 28, 2016, and July 14, 2016, counsel for the parties filed various motions to substitute new attorneys and to realign the parties for purposes of the case style, which the Court granted. *See Orders* (doc. #69, doc. #71). The docket activity prompted the Clerk to reassign the case to the docket of United States District Judge Michael H. Schneider, as Judge Hannah passed away in 2003. On August 3, 2016, Judge Schneider in turn referred the proceeding to the undersigned United States Magistrate Judge for recommended disposition. *See Order* (doc. #67). On September 13, 2016, the case was reassigned to United States District Judge Ron Clark upon Judge Schneider's retirement. Finally, the parties consented to the undersigned magistrate judge for all matters, including trial and entry of judgment pursuant to 28 U.S.C. § 636(c), and Judge Clark entered his corresponding *Order of Reference* (doc. #82) on November 7, 2016.

The parties then jointly requested the entry of a scheduling order setting out certain deadlines. The Court issued scheduling orders (doc. #73, doc. #91) culminating in a motion hearing before the undersigned on May 11, 2017. *See Minute Entry* (doc. #113), *Transcript* (doc. #115). The hearing focused on the legal issues regarding the NIGC's 2015 interpretation of IGRA's application and related case law.

On February 6, 2018, the undersigned issued a memorandum opinion and order on the competing dispositive motions and pending legal issues relevant to the NIGC opinion, Naskila, and the Restoration Act. *See Order* (doc. #129). In summary, the Court partially granted the State's motion for declaratory judgment/injunctive relief regarding legal issues governing the

8

permissibility of the gambling activities ("Those motions are granted with respect to the State's request for a declaration from the Court that the Restoration Act and, consequently, Texas law, applies to the Tribe's gaming activities.")   *Id.*   at p. 26. The undersigned deferred ruling on the State's request for relief regarding contempt findings and damages, pending appeal. *Id.*  In support, the Court explained

> Having concluded that the Restoration Act applies, the Court finds it unnecessary to reach the question of whether the activities conducted at Naskila constitute Class II or Class III gaming under IGRA at this juncture. To the extent that the parties' motions seek relief on this issue, that relief is denied as moot, without prejudice to reassert. As indicated above, the Court further defers any finding on the State's contempt allegations and corresponding request for damages and fees until after conducting a hearing and making proper evidentiary findings.

*Id.*

The Tribe appealed the Court's opinion.  On March 19, 2019, the Fifth Circuit affirmed the undersigned's holding.  *See Texas v. Alabama Coushatta Tribe of Tex.*, 918 F.3d 440 (5th Cir. 2019), *cert. denied* 140 S. Ct. 855 (2020).  In sum, the Fifth Circuit held that under *Brand X*, "a court should not defer to an agency's interpretation of a statute if a "judicial precedent hold[s] that the statute unambiguously forecloses the agency's interpretation." *Id.* at 449 (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Services*, 545 U.S. 967, 982–83 (2005)).  Consequently, the Fifth Circuit held that the NIGC's decision that IGRA applies to the Tribe does not displace *Ysleta I*. *Id.*  Citing *Yselta Del Sur Pueblo v. Tex.*, 36 F.3d 1325 (5th Cir. 1994), *cert. denied* 514 U.S. 1016 (1995).  "We thus reaffirm that the Restoration Act and the Texas law it invokes—and not IGRA—govern the permissibility of gaming operations on the Tribe's lands." *Id.*  IGRA does not apply to the Tribe, and the NIGC does not have jurisdiction over the Tribe. The district court did not abuse its discretion in denying relief from the permanent injunction.  The order denying the motion for relief from judgment is AFFIRMED." *Id.*

The Supreme Court denied certiorari on January 13, 2020 (doc. #148).  On March 30, 2020, the parties jointly moved for a briefing schedule and a scheduling order regarding the remaining issues.  The entered several scheduling orders and continuances, resulting mostly from the ongoing COVID-19 pandemic and corresponding lockdowns on the Tribe's land.  Ultimately, the parties filed competing briefs regarding the contempt motions in accordance with the schedule and the case proceeded to a bench trial.

      C.      Current Issues and Pending Contempt Motion

The parties previously agreed to an evidentiary show cause hearing regarding the factual issues on contempt.  Now that the issues regarding application of the Restoration Act issues have been decided, the legal framework centers on whether the Tribe should be held in contempt for participating in the type of gaming available at Naskila.

Pursuant to a post-appeal briefing order, the State filed its *Second Amended Motion for Contempt and Motion to Show Cause* (doc. #160).  The motion presents the issue of whether the Tribe is in violation of this Court's 2002 injunction prohibiting the Tribe from engaging in gaming activities that are impermissible in Texas. "The State therefore requests that the Court order that the Tribe show cause why it should not be held in contempt of the Court's injunction. The State further requests that the Court enjoin the Tribe's impermissible gaming operations following the bench trial."  *See Second Amended Motion for Contempt*, at p. 1.  More specifically, the State argues that the Tribe's activities violate provisions of the Texas Penal Code prohibiting gambling, the Texas Bingo Enabling Act, and the Texas Civil Practice and Remedies Code. *See id.* at pp. 6-10.  In sum, the State seeks relief in the form of an order directing the Tribe to show cause why the Tribe should not be held in contempt for failing to comply with the 2002 Injunction.  The State

further requests that the Court issue an order finding the Tribe in contempt of the 2002 Injunction and ordering the Tribe to:

"A. Cease all electronic bingo operations at Naskila Entertainment Center; and

B. Remove all computers, software, hardware, and any other equipment the Tribe currently uses as a gambling device from the Naskila Entertainment Center that relate to any game with cash prizes or cash equivalent prizes."

The State further requests that:

"C. Upon the entry of the contempt order, the Court assess a penalty for any day of operation beyond the date of the order; and,

D. The Tribe only should pay costs to the State of the June 15th investigation conducted in this case, as well as any Court costs and attorneys' fees incurred after June 15, 2016."

*See id.* at p. 10.

The Tribe responds by arguing that the Court should deny the Contempt Motion. The Tribe maintains that the evidence will show that the Tribe is engaged in the gaming activity of bingo and, thus, cannot be held in contempt of a 2002 Injunction directed at different gaming activities. The Tribe further avers that the bingo conducted on the Tribe's lands complies with the terms of the Restoration Act, as the Texas laws and regulations do not prohibit that gaming activity. *See Tribe's Response to State's Second Amended Motion for Contempt* (doc. #161).

The parties also filed a reply and sur-reply (doc. #162, doc. #163). The Court notes that the parties' briefs in total are much more detailed than summarized here, but the undersigned will refrain from restating the parties' arguments at length.

11

## II.      Discussion

### A.   Findings of Fact

1. On October 8, 2015, the NIGC concluded that the Tribe could offer Class II gaming—specifically, bingo—on the Tribe's reservation under IGRA, and concurrently approved the Tribe's proposed Class II gaming ordinance.  *See* Letter from NIGC Chairman Chaudhuri (Oct. 8, 2015), Tribe's Exhibit No. 25 (doc. #186-27); *see also* Stipulation of Fact No. 2, Joint Pre-Trial Order (doc. #177), at p. 4.

2. The State and the Tribe subsequently entered into a Pre-Litigation Agreement, in which the Tribe advised the State that it intended to open a gaming facility, and the State agreed not to seek prior injunctive relief to stop the initial opening of the Tribe's gaming facility in exchange for the right to inspect the facility once it opened.  *See* Pre-Litigation Agreement, Tribe Exhibit No. 31–2 (doc. #186-33); *see also* Testimony of Keith Sherer, Trial Tr. Vol. 1, at pp. 93–94 (doc. #184).

3. The Tribe opened Naskila Gaming, an entertainment center located on the Tribe's reservation, on May 16, 2016.  *See* Stipulation of Fact Nos. 4–5, Joint Pre-Trial Order (doc. #177), at p.  4.

4. Naskila Gaming is owned by the Tribe and managed by the Tribal Economic Development Authority.  *See* Testimony of Doug Searle, Trial Tr. Vol. 2, at p. 225 (doc. #185).  The operations of Naskila Gaming are overseen by a General Manager/Chief Operating Officer, who in turn manages a number of department directors, including: a Director of Surveillance, Director of Gaming Operations, Director of Community Development, Director of Compliance, Director of Internal Audit, among others.  *See id.*  Trial Tr. Vol 2, at pp. 225–229; *see also* Naskila Gaming Administration Organization Chart, Tribe's Exhibit No. 117 (doc. #186-118).

5.  Naskila Gaming offers a specific game of chance that is commonly known as bingo, where prizes are awarded on the basis of designated numbers or symbols conforming to randomly selected numbers or symbols.  *See* Testimony of Nick Farley, Trial Tr. Vol. 1, at pp. 172–173, 184–185, 200–201; *see also* Farley Expert Report, Tribe's Exhibit 40 (doc. #186-42); Tex. Occ. Code § 2001.002(4) (West 2021)[7]; *see generally* Farley Expert Report, at pp. 8-9, (concluding that the Naskila Gaming facility owned by the tribe "offers the game commonly known as Bingo to its customers" with "an alternative entertaining display of spinning reels in addition to the Bingo card and Bingo ball draw from which the alternative entertaining display of spinning reels is derived").

6.  Naskila Gaming has not offered blackjack, poker, slots, or any other game of chance—other than bingo—since the facility opened.  *See* Sherer Testimony, Trial Tr. Vol. 1, at pp. 95–96; Testimony of Brian Callaghan, Trial Tr. Vol. 1, at pp. 143, 145–147; Searle Testimony, Trial Tr. Vol. 2, at p. 232.

7.  On June 15, 2016, the State conducted an inspection of the gaming activities offered at Naskila Gaming.  *See* Sherer Testimony, Trial Tr. Vol. 1, at p. 94.  Chief Deputy Daniel Guajardo conducted the inspection as an investigator for the State.  *See* Testimony of Daniel Guajardo, Trial Tr. Vol. 1, at p. 49.  During that inspection, Naskila Gaming's Executive Director of Operations, Keith Sherer, explained to the State how the player terminals at Naskila Gaming allowed players to play bingo.  *See* Sherer, Trial Tr. Vol. 1, at pp. 124–125.

a.  Each player terminal displays an electronic pre-numbered bingo card; the player terminals are connected to a server that conducts a virtual ball call or drop; and players win prizes if

---

[7] The Texas Bingo Enabling Act defines "bingo" as a "specific game of chance, commonly known as bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols conforming to randomly selected numbers or symbols."

numbers from the virtual ball call achieve a game-winning pattern on the player's bingo card. *See* Sherer, Trial Tr. Vol. 1, at pp. 99, 109–121, 124 (testifying to functionality of gaming machines depicted in Tribe's Exhibits 129 and 130 (videos of gaming machines, which are "fairly representative of other machines at Naskila"); *see also* Farley Testimony, Trial Tr. Vol. 1, at pp. 185–186, 189–190; Expert Report of Nick Farley, at p. 8 (concluding that gaming systems at Naskila Gaming facilitate the play of bingo with each player terminal displaying a bingo card, a bingo ball draw, and the bingo card is highlighted with matching balls drawn and winning bingo patterns).

b.  The bingo software offered on some player terminals may allow the player to change the bingo card for a different pre-numbered bingo card, but only one bingo card may be played at a time on a player terminal. *See* Sherer Testimony, Trial Tr. Vol. 1, at pp. 101–102, 111, 113.

c.  The game-winning bingo patterns are available for players to view on the player terminal, typically by accessing an on-screen "help" menu. *See* Sherer Testimony, Trial Tr. Vol. 1, at pp. 107, 119.

d.  The player terminals feature an entertainment display where the results of the bingo game may be displayed to the player in various entertaining ways. That entertainment feature often takes the form of spinning reels with symbols, which play no role in determining whether a player wins or what prize may be awarded for the game played on the player terminal; the results of a bingo game also may be displayed through other "bonus" features intended to create suspense or excitement for the player. *See* Sherer Testimony, Trial Tr. Vol. 1, at pp. 102–103, 106, 121–124; *see also* Farley Expert Report, at pp. 8-9 (concluding that the player terminals feature "an alternative entertaining display of spinning reels in

14

addition to the Bingo card and Bingo ball draw from which the alternative entertaining display of spinning reels is derived").

e. The player terminals contain various notices informing players that:

- "Game determination is based on the bingo pattern only.  Any other displays and reels are for entertainment purposes only."

- "Reel patterns are for entertainment purposes only and indicate prizes for bingo patterns matched."

- "Pseudo pay table.  Game determination is based on the bingo pattern only."

*See* Sherer Testimony, Trial Tr. Vol. 1, at pp. 100–101, 109, 115–116.

8. The bingo conducted by the Tribe reflects how bingo has evolved over the centuries:  the player terminals feature an electronic bingo card; the ball call or drop is conducted by a server that randomly generates the ball call or ball drop numbers—a feature that makes the game more secure and less susceptible to fraud or mistake; the bingo software automatically daubs the player's bingo card and identifies any game-winning patterns for the player; and the results of the bingo game may be displayed in various entertaining ways.  *See* Farley Testimony, Trial Tr. Vol. 1, at pp. 173–178.

9. The bingo software played on Naskila's player terminals is distinguishable from a slot machine, because a slot machine is a stand-alone device that uses a random number generator to select a stop position on the reels and award prizes.  *See* Farley Testimony, Trial Tr. Vol. 1, at p. 183.  For example, in a three-reel slot machine, the random number generator will pick three numbers from a pool of numbers as the stop positions, the reels will spin and stop based on the stop-position determined by the random number generator, and the symbols displayed on the reels determine whether a player wins a prize and the value of the prize.  *See id.*  Bingo,

by contrast, is based on drawing numbers or symbols from a pool of numbers or symbols that are then matched against a pre-numbered bingo card and, depending on the numbers that match, there could be a bingo pattern that awards a prize. *See id.* at pp. 183–184.  The spinning reels on a player terminal that runs bingo software are merely an alternative entertaining display of the results of the bingo game, where the pattern achieved on the bingo card (if any) is translated into a winning reel pattern. *See id.*  at p. 190.

10. Prior to the State's inspection of Naskila, Doug Sherer also met with the Attorney General's Office in Austin where he described the mechanics of the electronic bingo offered at Naskila Gaming.  *See* Sherer Testimony, Trial Tr. Vol. 1, at p. 125.  The bingo software played on the player terminals at Naskila Gaming is distinct from a slot machine in that the game is not played against the machine; the bingo software must be able to identify two players to link together to play a bingo game.  *See* Sherer Testimony, Trial Tr. Vol. 1, at pp. 98–99, 125–126. If a player sits down at a player terminal at Naskila Gaming and tries to initiate a game and the server is unable to identify a second player, then the game cannot be played and the bet will be refunded.  *See id.*  at p. 99.  For that reason, Mr. Sherer was unable to bring a representative machine to the meeting with the Attorney General's Office to demonstrate how the machine played bingo; however, the State was able to view how the player terminals operated during its June 2016 inspection of Naskila Gaming.  *See id.*  at pp. 125–126; *see also* Guajardo Testimony, Trial Tr. Vol. 1, at pp. 50, 52-57.

B.      Conclusions of Law

 (1).  Applicability of the 2002 Permanent Injunction; Standard of Review for Contempt

A party seeking to enforce an injunction through contempt must establish by clear and convincing evidence that (1) "the order required specified conduct by the respondent," with which "the respondent failed to comply," *United States v. City of Jackson*, 359 F.3d 727, 731 (5th Cir. 2004), and (2) the respondent had "actual notice" of the specific conduct subject to the injunction, *see* FED. R. CIV. P. 65(d)(2); *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995); *see also Hornbeck Offshore Servs., L.L.C. v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013).   A party commits contempt when it violations a "definite and specific order" of the court requiring it to perform or refrain from performing a particular act or acts with knowledge of the court's order. *See Salazar*, at 792 (quoting *Travelhost*, at 961).  The clear and convincing standard is higher than the preponderance standard, but not as high as beyond a reasonable doubt.   *Travelhost*, at 961. Clear and convincing evidence is that weight of proof which produces in the mind of the trier of fact a firm belief or conviction ... so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of precise facts of the case. *Salazar*, at 792 (quoting *Shafer v. Army & Air Force Exch. Serv.,* 376 F.3d 386, 396 (5th Cir. 2004)).

Judge Hanna's 2002 Injunction enjoins the Tribe from offering the particular gaming activities that the Court concluded violated the Restoration Act.   The language of the 2002 Injunction specifically ordered the Tribe to "cease and desist operating, conducting, engaging in, or allowing others to operate, conduct, or engage in gaming and gambling activities on the Tribe's Reservation *which violate State law*."   *See Injunction* (doc. #36), at p. 22 (emphasis added).  This is consistent with the Court's contemporaneous descriptions of the 2002 Injunction as barring

"continuation" of the gaming activities adjudicated by Judge Hannah.  This is bolstered by the "cease and desist" language of the injunction.  The Court finds that because the Tribe was not then-offering bingo, the 2002 Injunction cannot be construed in a manner that would subject the Tribe to contempt for purportedly violating the Restoration Act by engaging in a different gaming activity (bingo) that the Court has never adjudicated under that Act.  While a district court need not spell out in detail the means in which its order must be effectuated, the injunction's provisions must be clear in what conduct has been mandated and prohibited.  *See Salazar*, at 793 (quoting *Am. Airlines Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578-79 (5th Cir. 2000)).  The activities currently offered at Naskila do not fall directly within an "express or clearly inferable obligation" placed upon the Tribe by Judge Hannah's Injunction.  *See id*.  This is especially the case given that Texas law permits bingo under certain regulated circumstances, as explained below, whereas the 2002 Injunction speaks specifically to gaming activities which violate Texas law.  The Court is unpersuaded that the Tribe's activities at Naskila fall within the "definite and specific" language of Judge Hannah's 2002 Injunction.  For these reasons alone, the Court finds the State's request for contempt to be procedurally problematic.  The undersigned further finds, however, that the motion may be denied on other grounds in construing the plain language of the Restoration Act and Texas law.

(2).  Relevant Framework Under Texas Gaming Law

In Texas, gambling is generally prohibited.  *See Dep't of Tex., Veterans of Foreign Wars v. Tex. Lottery Comm'n*, 760 F.3d 427, 431 (5th Cir. 2014).  However, in 1990, the Texas Constitution was amended to establish an exception to this prohibition for charitable bingo.  *See* TEX. CONST. ART. III, § 47(a)-(b); *Veterans of Foreign Wars*, at 431.  The State excepted bingo by

by allowing the Texas legislature to "authorize and regulate bingo games" conducted by various nonprofit organizations.  *See* TEX. CONST. ART. III, § 47(b).

Pursuant to that authority, the Texas legislature enacted the Texas Bingo Enabling Act, which defines "bingo" as "a specific game of chance, commonly known as bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols conforming to randomly selected numbers or symbols."  TEX. OCC. CODE § 2001.002(4) (West 2021).  The Texas Bingo Enabling Act sets forth a licensing regime for bingo that is overseen by the Texas Lottery Commission.  *See id.* at §§ 2001.003-2001.161.  Only "an authorized organization" that applies for and receives a license issued by the Texas Lottery Commission may conduct bingo.  *Id.* at § 2001.101; *see also id.*; at § 2001.411.  The license issued by the Texas Lottery Commission includes, among other things, "the address of the premises where and the time when bingo is to be conducted."  *Id.* § 2001.106.  The Bingo Enabling Act taxes bingo through licensing fees and bingo prize fees collected by the Texas Lottery Commission.  *See id.*; at §§ 2001.003, 2001.158; 2001.502; 2001.504.

Bingo operators are required to collect a five percent "bingo prize fee" that is paid to the Texas Lottery Commission and, under certain circumstances, the county or municipality in which bingo is conducted.  *Id.* at § 2001.502.  The revenue collected from the fee on prizes is credited to the general revenue fund and considered miscellaneous revenue for purposes of appropriations.  *See id.* at § 2001.507.  Each license-holder is required to furnish some form of security to the Texas Lottery Commission to secure payment of the bingo prize fees.  *See id.* § 2001.514.  In addition, bingo operators are required to submit quarterly reports under oath to the Texas Lottery Commission itemizing the amount of gross receipts derived from bingo, expenses incurred or paid, net proceeds derived from bingo, the use to which the proceeds were applied, and a list of prizes

given.  *See id*. § 2001.505.  The Texas Tax Code[8] also applies to the administration, collection and enforcement of the bingo prize fees imposed by the Bingo Enabling Act, such that "the fees on prizes is treated as if it were a tax."  *Id*. § 2001.512.  The Bingo Enabling Act therefore regulates the manner and means by which bingo may be conducted in the State of Texas.  *See Veterans of Foreign Wars*, at 437 (citing TEX. OCC. CODE ANN. §§ 2001.055, 2001.419, 2001.313 and finding the Bingo Enabling Act implements a "regulatory scheme" through which the Texas Lottery Commission "regulates all bingo-related activities, including the types of games played, game frequency and times, and bingo-employee qualifications").

In addition, the Texas Lottery Commission has enacted certain administrative rules for the conduct of bingo under the Bingo Enabling Act.  *See, e.g.* 16 TEX. ADMIN. CODE §§ 402.100–402.709.  Through this statutory framework, the State of Texas controls where bingo may be conducted.  *See, e.g.,* TEX. OCC. CODE §§ 2001.402; 2001.404.  The State also controls how often bingo may be conducted; how much a bingo operator may charge and pay in prizes for a bingo game, how a bingo operator may accept payment and deliver a prize, and how bingo proceeds are maintained and used.  *See id*.  at §§ 2001.419; 2001.413; 2001.420; 2001.409(a)(2)–(3); 2001.410(a)(3); 2001.451; 2001.452; 2001.453; 2001.454; and 2001.458, respectively.

The Bingo Enabling Act ensures compliance by, among other things, (1) granting the Texas Lottery Commission the power to revoke an operator's license for non-compliance with its provisions (including the operating, taxing, and reporting requirements described above), *see id.* at §§ 2001.353, 2001.355, 2001.554; and (2) making it a third-degree felony to conduct bingo without a license, *see id.* at § 2001.551(b)&(c).

---

[8] *See* TEX. TAX CODE § 111.001 *et seq*.

(3.)  The Interplay Between Texas Law and the Restoration Act

The key provision of the Restoration Act at issue is Section 207, which governs gaming activities:

> (a) IN GENERAL.—All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe.  Any violation of the prohibition contained in this subsection shall be subject to the same civil and criminal penalties that are provided by the laws of the State of Texas.  The provisions of this subsection are enacted in accordance with the tribe's request in Tribal Resolution No. T.C.–86–07 which was approved and certified on March 10, 1986.
>
> (b) NO STATE REGULATORY JURISDICTION.—Nothing in this section shall be construed as a grant of civil or criminal regulatory jurisdiction to the State of Texas.
>
> (c)  JURISDICTION  OVER  ENFORCEMENT  AGAINST  MEMBERS.— Notwithstanding section 206(f),  the courts of the United States shall have exclusive jurisdiction over any offense in violation of subsection (a) that is committed by the tribe, or by any member of the tribe, on the reservation or on lands of the tribe.  However, nothing in this section shall be construed as precluding the State of Texas from bringing an action in the courts of the United States to enjoin violations of the provisions of this section.

*See* 25 U.S.C. § 737; Pub. L. No. 100-89, § 207.

The Fifth Circuit's interpretation of the Restoration Act in this litigation as well as the Yselta del Sur Pueblo cases indicates that the tribes are prohibited from engaging in any gaming activity prohibited by Texas law.  *See Al. Coushatta Tribe of Tex. v. Tex.*, 66 F. App'x 525, at *1 (5th Cir. 2003) (per curiam); *Yselta I*, 36 F.3d at 1335.  It has explained that the Restoration Act governs the determination of whether gaming activities proposed by the tribes are *allowed* under Texas law, which functions as surrogate federal law.  *See Yselta I*, at 1335 (emphasis added).

Within the constructs of the Court's previous ruling regarding the applicability of the Restoration Act and corresponding precedent, the Court finds that the issue before the undersigned may be narrowed to whether the gaming activity conducted at Naskila is "allowed" under Texas law.  Put another way, the Court considers whether the Tribe's gaming operation is

"impermissible" under Texas law.  *See State v. Ysleta Del Sur Pueblo*, 955 F.3d 408, 416 (5th Cir. 2020) ("*Ysleta II*").

Texas does not prohibit or disallow "bingo" itself in its entirety, per se.  Rather, as described above, Texas *regulates* bingo by, among other thing, restricting the obtainment of a license to conduct bingo and prohibits the operation of bingo without a license.  *See, e.g.,* TEX. OCC. CODE § 2001.101(a).  Furthermore, Texas prohibits the operation of bingo when it does not comply with its restrictions concerning when, where, and how bingo may be conducted in accordance with Texas law.  The Texas Penal Code specifically criminalizes bingo activities which do not confirm with the Bingo Enabling Act.  *See* TEX. PENAL CODE § 47.02.

In contrast, Section 207(b) of the Restoration Act explicitly states that "nothing in this section shall be construed as a grant of civil or criminal regulatory jurisdiction" to the State.  25 U.S.C. § 737(b); Pub. L. 100-89, § 207(b).  The plain language therefore bars the State from enforcing its regulatory jurisdiction over bingo through criminal means on the Tribe's lands.  The same language likewise precludes the State from asserting regulatory jurisdiction over bingo gaming on the Tribe's lands through the "civil" regulatory means of a common nuisance suit predicated on gambling under Chapter 125 of the Texas Civil Practice and Remedies Code.  Stated another way, the Court finds that the language of the Restoration Act does not permit the State to exercise its regulatory authority over the Tribe by way of the Bingo Enabling Act or through a nuisance suit.  A simplistic rule depending on whether the statute includes penal sanctions could result in conversion of every regulatory statute (e.g., the Bingo Enabling Act) into a prohibitory one.  *See Seminole Tribe of Fla. v. Butterworth*, 658 F.2d 310, 314 (5th Cir. 1981); *see also Ysleta I*, at 1330 (discussing the criminal-prohibitory/civil-regulatory dichotomy).  The Court finds that

22

this was not the intent of the drafters of the Restoration Act and any such imposition of regulatory authority over the Tribe the State would be an overreach under the Act.

The Court acknowledges that the Fifth Circuit's latest decision in the Yselta del Sur Pueblo litigation concerned some of the same issues.  *See Yselta II*, 955 F.3d 408 (5th Cir. 2020). *Yselta II* is not wholly on point, however, under the procedural posture and circumstances of the current case.  Although the Fifth Circuit considered state bingo law and regulations in *Yselta II*, it only reached one issue of Restoration Act interpretation.  It deferred to *Yselta I*, which held that the Restoration Act did not incorporate the criminal-prohibitory/civil-regulatory test used in Public Law 280[9] cases to determine whether a law falls within a state's civil or criminal jurisdiction.  *See Yselta II*, at 414.  In addressing the position advanced by the Pueblo relative to bingo activities, the Fifth Circuit touched on arguments which are not at issue here - (1) whether "prohibit" has a special meaning in federal Indian law as used by the Supreme Court in *Cabazon Band*,  (2) whether courts should apply the *Cabazon Band* criminal-prohibitory/civil-regulatory distinction as the Supreme Court did when applying IGRA.  *Yselta II*, at 414.  The language in *Yselta II* referencing "regulations" does not alter the undersigned's findings.  *See id*. at 414-415.  Section 207 specifically delineates gaming activities that are *prohibited* by Texas law.  Texas does not prohibit bingo by law *or* regulation.  To prohibit and to regulate are distinguishable not only by definition[10], but also in the context of the laws at issue here.  The latter is not included in the language of the Restoration Act, other than a specific statement that nothing in the Act should be

---

[9] Public Law 280 was at issue in *Cabazon Band*, 480 U.S. 202 (1987) and *Bryant v. Itasca County*, 426 U.S. 373 (1976).  In Pub. L. 280, Congress expressly granted six states jurisdiction over specified areas of Indian country within those states and provided for the assumption of jurisdiction by other states.  *Cabazon Band*, 480 U.S. 208.  Public Law 280 is distinguishable from the Tribe's Restoration Act.

[10]  Prohibit is "1. To forbid by law.  2.  To prevent, preclude, or severely hinder."  Regulate is "1. To control (an activity or process) esp. through the implementation of rules.  2**.**  To make (a machine or one's body) work at a regular speed, temperature, etc."  Black's Law Dictionary (11th ed. 2019);

construed as granting regulatory jurisdiction.  The Fifth Circuit's decision in *Yselta II* does not resolve the issues currently present in this case.

The Court already determined that the Restoration Act applies to the Tribe's gaming operations.  In considering the plain language of the Restoration Act, Sections 207(a) and (b) are naturally reconciled to allow the State to enforce laws prohibiting gaming outright.  Specific to this case, however, if the State permits a gaming activity pursuant to certain regulations – here, bingo – under the language of the Restoration Act, the Tribe may engage in that gaming activity independent from the State's regulatory jurisdiction.  *See Yselta I*, at 1330 (discussing *Cabazon Band*'s holding, 480 U.S. at 209 (California's bingo statute at issue in *Cabazon Band* was not criminal in nature on the basis that it was "not a general prohibition on certain conduct."  Instead, "the state law generally permits the conduct at issue, subject to regulation.")

This interpretation is supported by the legislative history of the Restoration Act.  The record shows that Congress did not adopt language specifically requested by the Tribe's Tribal Resolution No. T.C.-86-07, which originally sought an absolute prohibition on all "gaming, gambling, lottery, or bingo, as defined by the laws and administrative regulations of the State of Texas."  *See* Tribal Resolution No. T.C.-86-07, Tribe's Ex. No. 71 (doc. #186-72).  Congress did not include this language banning all gaming as defined by Texas law when it enacted the Restoration Act.  *See* Section 207(a) of the Restoration Act; *Alabama-Coushatta Tribe of Tex.*, 918 F.3d at 443 n. 3 ("The significance of the Restoration Act's reference to the Tribe's resolution is disputed.  The state contends that the resolution represents a *quid pro quo* in which the Tribe agreed to foreswear gaming for all time in exchange for passage of the Restoration Act.  The Tribe examines the evolution of drafts of the Restoration Act and emphasizes that strong prohibitory language was ultimately deleted. In any event, the stringent prohibition proposed by the resolution

was not included.")  If Congress had intended to provide for direct application of Texas laws that *regulate* gaming on the Tribe's lands, it would have expressly stated as much.  *See Bryan v. Itasca Co., Minn.*, 426 U.S. 373, 390 (1976) (". . .if Congress in enacting Pub. L. 280 had intended to confer upon the States general civil regulatory powers. . .over reservation Indians, it would have expressly said so.")

In sum, the Court finds that the result must flow from the plain language of the governing Restoration Act and the State's authority over the Tribe's activities on its lands under the Act.  As discussed herein, bingo is not *per se* prohibited by Texas law.  The Court finds that the evidence presented at the bench trial shows that the Tribe is in fact conducting bingo on its land.  The dispute therefore turns on whether the State can bar the Tribe's bingo activities under the Texas regulatory framework governing bingo.  The Court finds that because the State regulates bingo gaming, that gaming activity is not "prohibited by the laws of the State of Texas" within the meaning of Section 207(a) of the Restoration Act.  Section 207(b) of the Restoration Act further emphasizes that nothing in the Restoration Act should be construed as a grant of regulatory jurisdiction to the State over the Tribe's present bingo activities through civil or criminal means.  *See* Pub. Law 100-89, § 207.  The Court therefore concludes, based on the evidence presented, that the Tribe's bingo gaming activities conducted at Naskila are not subject to the State's restrictions governing bingo unless and until the State of Texas prohibits that gaming activity by law outright, as it has done with other gaming activities.  The Restoration Act only prohibits on the Tribe's lands those gaming activities that are "prohibited"—not regulated—by the laws of the State of Texas.  Moreover, Section 207(b) of the Restoration Act bars the State from exercising regulatory jurisdiction, through civil or criminal means, over gaming activities conducted on the Tribe's lands.

Accordingly, the Tribe's bingo gaming is not subject to the laws of the State of Texas unless and until the State of Texas prohibits that gaming activity outright.

For these reasons, the Court also concludes that the State failed to establish by clear and convincing evidence that the Tribe should be held in contempt.  There is not clear and convincing evidence supporting a finding that the Tribe engaged in specific gaming conduct violative of the direct prohibitions stated in Judge Hannah's 2002 Injunction.

### III.    Concluding Statements and Order of the Court

The Court therefore **DENIES** the State's request for the Tribe to show cause and to hold the Tribe in contempt (doc. #160).   The Court further **DENIES** the State's request to enjoin the bingo gaming currently offered on the Tribe's reservation.

It is so ordered.

**SIGNED this the 31st day of August, 2021.**


KEITH F. GIBLIN
UNITED STATES MAGISTRATE JUDGE